**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Devine STEED, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Floyd G. HINTZ, Defendant-Appellant.**

**Nos. 71–2299, 71–2252.**

United States Court of Appeals, Ninth Circuit.

Sept. 5, 1972.

Certiorari Denied Dec. 18, 1972. See 93 S.Ct. 697.

**1312**

Len W. Holt (argued), Berkeley, Cal., Robert W. Ripley (argued), San Diego, Cal., James Devine Steed, in pro. per., for defendant-appellant.

Stephen G. Nelson, Asst. U. S. Atty. (argued), Robert H. Filsinger, Asst. U. S. Atty., Harry D. Steward, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before JERTBERG, BROWNING and GOODWIN, Circuit Judges.

JERTBERG, Circuit Judge:

Appellants, James Devine Steed and Floyd G. Hintz, and one Sergio Anthony Sanz, were charged in a three-count indictment returned by the Grand Jury for the Southern District of California.

Count One charged the three, beginning at a date unknown and up to and including July 17, 1970, with conspiracy to smuggle marijuana into the United States, and to receive, conceal and sell, and facilitate the transportation, concealment and sale of marijuana after its importation;

Count Two charged the three with intent to defraud the United States, knowingly smuggled and clandestinely introduced into the United States from Mexico, on or about July 17, 1970, approximately 1,400 pounds of marijuana, which had not been declared or presented for inspection; and

Count Three charged the three with intent to defraud the United States, knowingly received, concealed and facilitated the transportation and concealment of the 1400 pounds of marijuana on or about July 17, 1970, which they knew had been imported and brought into the United States contrary to law, all in violation of 21 U.S.C. Sec. 176a.

Prior to trial the charges against Sergio Anthony Sanz were severed and we are not concerned on this appeal with his case.

Following trial to a jury, appellants were convicted on all three counts, and each appellant was committed to the custody of the Attorney General for a period of fifteen years on each count, the sentences to run concurrently, and each was fined the sum of $10,000.00 and to stand committed until payment of the fine.

We first summarize the relevant facts, considered in the light most favorable to the appellee. The appellant, Steed, a resident of Marysville, Washington, was and had been employed for several years by the United Air Lines as a navigation officer, and on or prior to July 16, 1970, obtained possession of a Piper Aztec twin-motor aircraft.

On July 16, 1970, defendant Sanz entered the United States from Mexico, through the Calexico Port of Entry, as

the driver of an automobile. He had no California driver's license with him. He rented a room at a Calexico motel under the name of Anthony Faratta, and in the afternoon of that day a long distance call was placed from the motel room to a telephone in Marysville, Washington, which telephone was listed to Steed.

Accompanied by Hintz, Steed piloted the plane to the Imperial County Airport where they landed in the early hours of July 17, 1970. The two men checked in at the airport motel on July 17.

On the morning of July 17, Sanz visited with Steed at the airport motel. On the same day Sanz returned to Mexico through the Calexico Port of Entry. Shortly thereafter appellants drove into Mexico, through the Calexico Port of Entry, in an automobile rented by Steed.

After appellant had gone into Mexico, the interior of the aircraft was examined by looking in the side windows which were about five feet in height in relation to the ground. Two front seats were observed, but no back or rear seats. The cargo area immediately behind the front seats was empty.

After spending several hours in Mexico, appellants returned to Imperial Airport at about sun down on July 17. Appellants departed in the aircraft from the Imperial County Airport, without filing any flight plan, in a southwesterly direction toward Mexico. The aircraft landed at the Reno, Nevada Airport about 11:00 p. m., of that day. The plane was refueled at the direction of Steed. The cargo area behind the two seats in front was observed to be stacked with boxes all the way to the ceiling of the aircraft. They appeared to be shoe boxes.

After refueling, the aircraft left the fueling area and with landing lights and revolving beacon on, proceeded to the run-up area preparatory to take-off. In the meantime a Customs Agent had requested the Reno Police Department and the Sheriff's Office at Reno to intercept and detain the plane.

While the aircraft was at the run-up area the Air Traffic Control Officer simulated a complete electrical failure on the airport. Steed made requests for permission to take off, but received no response.

When the two police cars arrived at the airport, the aircraft was still at the runway area. The two cars flashed the plane with red and white spotlights. The aircraft moved to the active runway and proceeded to take off. It was pursued by both police cars, at a speed of seventy-five to eighty miles per hour, one on each side of the aircraft attempting to nudge the plane off the runway. During the chase the police cars opened fire on the plane which took off, turned off its lights, and disappeared.

The aircraft landed at Beaver Marsh, Oregon, an uncontrolled airport, in the early hours of the morning of July 18. Appellants left the plane at the airport, hitchhiked a ride to Bend, Oregon, about 4:30 a. m., of that morning where they rented a twelve foot van type truck, and returned to the airport. They were unsuccessful in moving the aircraft onto the runway. The cargo in the plane was removed and placed in the truck. They left the aircraft at the airport and departed from there in the truck.

On July 19, 1970, a search of the aircraft, pursuant to a search warrant issued by the United States Commissioner, resulted in the seizure of the following items:

Seeds and leafy matter

Paper towel with red stains on it

Two fingerprints on the steering wheel, right side of the cockpit

A fire extinguisher with a fingerprint on it

An ashtray from the right side of the cockpit with a fingerprint on it, and

An ashtray from the rear of the plane with a hand print.

All of said items were received into evidence at the trial over appellants' objections, except the last mentioned item. Bullet holes were observed on both sides

of the plane. On analysis the seeds and leafy matter were found to be marijuana; the red stains on the paper towel were found to be bloodstains of the type of Steed's blood; and the fingerprints were found to be the fingerprints of the appellants.

A witness (Judy Merrell), a stewardess for United Air Lines testified that on August 1, 1970, at a social party at Bainbridge Island near Seattle, Steed and Hintz, in her presence and in the presence of several other members of the party, stated in substance: that in coming back in a plane from Mexico, they landed "somewhere," and in taking off were chased by the police and shot at; that they landed the plane somewhere and hid the "pot" and "marijuana" that they had with them; and that they had gone into town and rented a car or truck and made it back to Seattle.

Another witness (Kathleen Coch), a stewardess for United Air Lines, stated in substance: that she had previously, as a stewardess, met Steed as a flight officer on a United Air Lines trip; that he told her that he had made big money, "$45,000 a trip" flying private charter to Mexico from Renton, Washington. Later, and on August 1, 1970, while riding in an automobile with Steed, he told her that he had received a bullet wound in his leg from a shooting incident in a plane. She further testified that in September of 1970, while visiting Hintz at his cabin on Bainbridge Island, she was present when a man known to her only as "Bill," paid Hintz in the neighborhood of $25,000 in currency and that at a later date Hintz told her that he was glad to get rid of the last of the "load" of marijuana. On a later occasion in September, 1970, while riding in an automobile with Hintz, he told her in substance of taking off from the Reno airport at night with police cars chasing and shooting at the plane; that the plane landed in Oregon; that he hitchhiked into town, got a van or truck, went back to the airplane, removed 500 kilos of marijuana, put it into the van, and drove to Seattle.

Appellant Hintz did not testify at the trial nor did he call any witnesses on his behalf.

Appellant Steed testified as a witness on his own behalf, but called no other witnesses.

Steed testified that he had rented the aircraft in Oregon, and with Hintz accompanying him, piloted the plane to the Imperial County Airport, where they landed on July 17, 1970; that one purpose of the trip was to evaluate the plane for use on charter trips; that he had a visit with defendant Sanz about the chartering of the plane for a hunting trip; that he and Hintz drove to Mexico in a rented car, and they spent several hours shopping, where they purchased a saddle and other leather goods; that they departed the Imperial County Airport and landed at the Reno Airport; that after refueling, and while taking off, the plane was pursued by two automobiles; that the occupants of the automobiles shot at the plane; that appellant did not stop the plane because he feared that the lessors of the plane were attempting to arrest him for not returning the plane within the rental period and also because he was anxious to return home in order to arrive in time to meet his next flight assignment from United Air Lines. Steed disclaimed any criminal participation in the charges set forth in the indictment.

We now consider the questions for review presented by the appellants.

Appellants contend that their Fourth Amendment rights were violated when the district judge denied their timely motions to suppress the evidence seized from the aircraft and admitted the same into evidence at the trial over their objections that the search warrant was invalid because the affidavit for the search warrant was prepared by the United States Commissioner and not the affiant, and that the contents of the affidavit were insufficient to establish probable cause.

The Fourth Amendment reads in part:

"* * * [N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The warrant to search the aircraft was issued pursuant to Federal Rules of Criminal Procedure 41(c) which states:

"A warrant shall issue only on affidavit sworn to before the judge or commissioner and establishing the grounds for issuing the warrant. If the judge or commissioner is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant * * *."

The affidavit for search warrant was sworn to and signed by Donald N. Clements, a Special Customs Agent of the United States Treasury Department, stationed at Calexico, California. The affidavit is dated July 19, 1970. The search warrant, bearing the same date, was issued by Frank J. Van Dyke, United States Commissioner stationed at Medford, Oregon.

■ The transcript of the evidentiary hearing, held by the district judge on appellants' motions to suppress, reveals that the affidavit for search warrant was prepared and typed by the United States Commissioner on information orally supplied to him by the affiant, after which the affidavit was read over by the affiant, and signed and sworn to by him.

There is nothing in the record to suggest that the affidavit includes any allegation or fact not orally supplied to the Commissioner by the affiant. No prejudice to appellants has been shown. If the Commissioner erred in preparing and typing the affidavit, we find such error to be harmless beyond a reasonable doubt. We do, however, issue a caveat to Commissioners and Magistrates not to indulge in such practice.

Appellants further argue that the contents of the affidavit are insufficient to establish probable cause for the issuance of the warrant, contending primarily that the matters alleged in the affidavit, represented therein to be within the personal knowledge of affiant, were in fact hearsay, based upon unidentified sources whose reliability was not established, and upon information orally furnished by affiant to the Commissioner, not appearing in the affidavit.

Following a lengthy evidentiary hearing on appellants' motions to suppress, the district court denied the motions, made findings of fact and conclusions of law, finding that the Commissioner had probable cause to believe that a crime had been committed and to issue the search warrant.

■ We have carefully reviewed the affidavit for issuance of search warrant and the transcript of the evidentiary hearing on the motions to suppress. The affidavit reveals much of the information appearing in the affidavit was from the personal knowledge of the affiant and from information furnished to him by fellow officers engaged in a common investigation. We believe such sources to be reliable, and that the affidavit for search warrant provided a sufficient basis for the finding by the Commissioner of probable cause. See United States v. Ventresca, 380 U.S. 102, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965).

■ Related to the foregoing is the contention of appellant Steed that he was denied due process because of his absence from the evidentiary hearing held on the appellants' motions to suppress. The record reveals that Steed was represented by counsel at the time of the hearing; that Steed and his counsel were notified of the time and place thereof; and that Steed's absence from the hearing was not induced by any conduct on the part of the government. Steed's absence from the hearing was a voluntary decision reached by Steed and his counsel. We find no error.

■ Early in the course of the trial of appellants, the district court was advised that a juror had her mind made up

as to the decision to be reached as a juror, and wished to be excused. Appellants' counsel were notified and consented to the procedure to be followed by the court whereby the juror could be questioned in chambers and excused, if necessary. She was examined in chambers in the presence of all counsel but out of the presence of the appellants. After examination, the juror was excused. Counsel for the appellants consented and stipulated to her discharge rather than have the district judge declare a mistrial. In court, in the presence of appellants, their counsel stipulated that the first alternate juror be seated in place of the excused juror. We find no error on the part of the district court.

■ Both appellants contend that the evidence was insufficient to permit the members of the jury in finding, beyond all reasonable doubt, that the appellants were guilty of the offenses charged. In our view the evidence was abundantly sufficient to establish their guilt beyond all reasonable doubt.

■ Appellant Hintz contends that he was denied due process by the action of the district court in sending the indictment to the jury room, at the request of the jury, during its deliberations.

Shortly after the jury had retired to the jury room for deliberations, the court received a note signed by the foreman requesting copy of the indictment. The district court in the presence of the appellants, their counsel, and Government counsel, informed them of the jury request. Both counsel objected to the court so doing. The court expressed the view that the matter rested within its discretion but that before so doing he would affix a photostatic copy of the instruction theretofore given to the jury. This was done and the indictment, with the affixed instruction, was furnished to the jury. Counsel stipulated that the instruction might be affixed to the indictment as long as the court overruled their objections. The affixed instruction reads as follows:

"First of all, you should be instructed that an Indictment is only a method of accusing a Defendant of crime. The Indictment is not evidence and you are not to infer from it that the Defendant is more likely to be guilty than innocent."

The record reveals that in the process of impanelling prospective jurors following the reading of the indictment, the court stated:

"You should be cautioned at the outset, each and every one of you, that the Indictment—the fact that a Grand Jury has returned an Indictment in this matter and the Defendants and each of them are in court for trial in this matter is no evidence whatsoever of their guilt. The Indictment process is merely a method by which under our system of justice a Defendant is informed of the charges against him and the matter is presented to the Court and to the jury for trial."

and that after the trial jury had been impanelled the district court stated:

"The fact that an indictment has been filed against the defendants or because they are brought here to stand trial, is no evidence whatsoever of the guilt of the defendants, and you are not permitted to infer or to speculate from that fact that they are more likely to be guilty than innocent."

The jury was elsewhere instructed in determining the guilt or innocence of the defendants they must be governed solely by the evidence presented during the course of the trial and that the facts must be determined only from the evidence received in court.

We find no abuse of discretion on the part of the district court in the circumstances of the instant case. See United States v. Press, 336 F.2d 1003, 1016 (2d Cir. 1964), cert. den. 379 U.S. 965 and 973, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965); and United States v. Hoffa, 367 F.2d 698, 713 (7th Cir. 1966).

Appellant Hintz contends that he was denied due process of law because of his

lack of representation by counsel at the hearings of certain preliminary motions.

The record discloses that on December 17, 1970, Hintz was arraigned in open court and entered a plea of not guilty. He was represented by Attorney James J. Keesling, who was also counsel for co-defendant Steed. Hintz, who was present in court and throughout the hearing held on the motion to suppress, joined in the motion of codefendants Steed and Sanz to suppress the evidence seized from the aircraft. Keesling also represented Hintz on preliminary motions both before and after the suppression hearing. The record justifies us in determining that Hintz was represented by Keesling at the hearing. We find no merit in Hintz' contention.

On February 16, 1971, the motion of the Government to compel Steed and Hintz to submit to the taking from each of a blood sample, and to compel Hintz to submit to the external inspection and photographing of his body, was heard by the district court. Hintz was not present at the hearing but was represented by Attorney Keesling. In connection with such hearing there appear in the record two documents, both dated February 15, 1971, and both bearing the signature of Hintz. One is designated "WAIVER OF PERSONAL APPEARANCE OF DEFENDANT HINTZ" and reads as follows:

"Defendant FLOYD G. HINTZ hereby waives his right to be personally present in the above-entitled court during all proceedings taking place on Tuesday, February 16, 1971 concerning the above-entitled action and in particular, in respect to plaintiff's motion to draw blood."

The other is designated "AUTHORIZATION TO REPRESENT DEFENDANT HINTZ" and reads as follows:

"Defendant FLOYD G. HINTZ hereby authorizes JAMES J. KEESLING to act as his attorney in the above-entitled court during all proceedings to take place on Tuesday, February 16, 1971 concerning the above-entitled action and in particular in respect to said defendant's motions for severance and separate trial, and resistance to plaintiff's motions scheduled for hearing on said day."

Clearly, Hintz voluntarily waived his right to be present at the hearing of the motions which were heard by the district court on February 16, 1971. We find no error.

On February 17, 1971, Hintz entered the appearance of Attorney James N. Pendleton as his attorney of record, and Pendleton served as Hintz' attorney in all other proceedings occurring thereafter, including the jury trial which commenced on February 23, 1971.

■ Hintz also contends that he was denied due process because the representation furnished by Pendleton was inadequate and ineffective. The standard to be applied to sustain such contention is that the inadequacy must have been such that the trial was a farce or a mockery of justice, or so ineffective as to shock the conscience of the court. See Leano v. United States, 457 F.2d 1208 (9th Cir. 1972) [decided February 29, 1972]; United States v. Garrett, 457 F.2d 1311 (9th Cir. 1972); Brubaker v. Dickson, 310 F.2d 30 (9th Cir. 1962).

■ We have carefully reviewed the record in the light of Pendleton's performance as Hintz' attorney, and conclude therefrom that Hintz was ably represented by competent counsel.

■ We find no error in Hintz' contention that the district court committed reversible error in denying Hintz' motion to sever his case from the trial. The motion was made near the close of the second day of trial, after a number of witnesses had testified and been excused.

Finally, Steed contends that the district court committed prejudicial error, in violation of his Sixth Amendment right of confrontation, by receiving into evidence the testimony of the witness, Kathleen Coch, relating to admissions made to her by Hintz, who did not testify as a witness.

In support of his contention Steed relies upon Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Bruton, and one Evans, were tried jointly on a charge of armed postal robbery. A postal inspector was allowed to testify as to an oral confession made to him by Evans which implicated Bruton as his accomplice. Evans did not take the stand. The district court instructed the jury that Evans' confession was competent evidence only as to him, and not as to Bruton. Both parties were convicted.

Bruton's conviction was reversed. The Court states at p. 126, 88 S.Ct. at p. 1622:

"We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment."

■ The law is clear that a violation of the rule set forth in *Bruton* does not require an automatic reversal. Reversal, however, can be avoided only if, after close and careful review of the facts and circumstances of each case, a reviewing court is able to declare a belief that the violation was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Certiorari was granted by the Court in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) to consider whether a violation of *Bruton* was, on the special facts there, harmless error under *Chapman*. In *Harrington*, commencing at page 251, 89 S.Ct. at page 1727, it is stated:

"We held in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief

that it was harmless beyond a reasonable doubt.' *Id.*, at 24, 87 S.Ct. at 828. We said that, although 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error' (*Id.*, at 23, 87 S.Ct., at 827), not all 'trial errors which violate the Constitution automatically call for reversal.' *Ibid.*"

In *Harrington*, the defendant was tried for murder jointly with three others. He admitted being at the scene of the crime but denied complicity. One of his codefendants, who confessed and implicated him, took the stand and was subject to cross-examination. The other two codefendants, whose statements corroborated defendant's presence at the scene of the crime, did not take the stand. Noting the overwhelming evidence of Harrington's guilt, and the relatively insignificant prejudicial impact of these codefendants' statements, the Court held that any violation of *Bruton* that had occurred was harmless error.

In Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the Supreme Court stated:

"The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."

In *Schneble*, the petitioner and his codefendant, Snell, were tried jointly in a Florida state court for murder. At the trial neither one took the stand. Police witnesses testified to certain admissions made by each defendant implicating both of them in the murder. The Court concluded at p. 432, 92 S.Ct. at p. 1060:

"[T]hat the 'minds of an average jury' would not have found the State's

case significantly less persuasive had the testimony as to Snell's admissions been excluded. The admission into evidence of these statements, therefore, was at most harmless error."

In the instant case prior to the calling of Miss Coch as a witness, in open court, with the jury present, the district court carefully instructed the jury that any testimony given by the witness as to statements made to her by Hintz, out of the presence of Steed, was to be received as evidence against Hintz, only, and not to be considered as evidence against Steed. A similar limiting instruction was given to the jury in the course of the giving of general instructions.

During the examination of Miss Coch, the jury was repeatedly reminded that the witness' testimony relating to statements made to her out of the presence of Steed was evidence against Hintz, not Steed.

The witness, Kathleen Coch, whose testimony is summarized above, testified that she was present and observed a man pay to Hintz a sum in the neighborhood of $25,000 in currency, and that later Hintz stated to her that he was glad to get rid of the last of the load of marijuana, and on a later occasion Hintz told her of taking off from the Reno Airport at night, with police cars chasing and shooting at the plane which landed in Oregon; that he hitchhiked into town, got a van or truck, went back to the airplane, removed 500 kilos of marijuana, put it into the van and drove to Seattle.

A review of the record discloses Steed testified that he rented the aircraft, flew the same to Imperial County Airport; that he rented a car and drove into Mexico; that he piloted the aircraft during the return trip to Oregon and landed at Beaver Marsh; that he rented a van type truck, returned to the aircraft, loaded the cargo of the plane into the truck, and departed in the truck for Seattle; that Hintz was his constant companion from the time of the departure from Oregon until the return.

The witness, Judy Merrell, whose testimony is summarized above, testified that Steed and Hintz, in her presence, stated in substance that in coming back in a plane from Mexico they landed "somewhere" and in taking off were chased by the police and shot at; that they landed the plane somewhere and hid the "pot" and "marijuana" that they had with them, and that they had gone into town and rented a car or truck and made it back to Seattle.

It is to be noted that except for the reference by the witness to statements made to her by Steed and Hintz that they hid the "pot" and "marijuana" that they had with them, the rest of her testimony is corroborative of testimony given by Steed on his own behalf. The discovery, on search of the plane, of marijuana seeds is corroborative of Steed's admission to Miss Merrell that there was marijuana in the aircraft when the plane was landed by Steed at Beaver Marsh, Oregon.

The witness Kathleen Coch testified that, prior to the events set forth in this opinion, Steed told her that he had made big money, "$45,000 a trip," flying charter to Mexico from Renton, Washington. She further testified that while riding in an automobile with Steed, he told her he had received a bullet wound in his leg from a shooting incident in a plane.

From our analysis and appraisal of the record, we have reached the conclusion that the proof of Steed's guilt, based on admissible evidence, was abundantly established. It is our belief, to paraphrase the quote above from *Schneble*, that the minds of an average jury would not have found the Government's case significantly less persuasive had the testimony as to Hintz' admissions to Miss Coch, made out of the presence of Steed, been excluded.

The violation of the *Bruton* rule, in light of the facts and circumstances of this case, constitutes harmless error beyond a reasonable doubt.

Other errors claimed or suggested to have occurred during the course of the proceedings before the district court have been examined by us and found to be without merit.

The judgments of conviction are affirmed.