UNITED STATES of America,
Plaintiff-Appellee,

v.

Willi BEUSCH and Deak & Company of
California, Inc., Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellant,

v.

Willi BEUSCH and Deak & Company of
California, Inc., Defendants-Appellees.

Nos. 78–1904, 78–2173 and 78–1577.

United States Court of Appeals,
Ninth Circuit.

May 10, 1979.

Wm. A. Brockett, San Francisco, Cal., for defendants.

Edward P. Davis, Jr., Asst. U. S. Atty., San Francisco, Cal., for U. S.

Before CARTER, BRIGHT * and CHOY, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

Deak & Company of California (Deak), headquartered in San Francisco, is a wholly-owned subsidiary of Deak and Co. of New York, the largest foreign currency exchange dealer in the world. Beusch was Vice-President and the senior corporate officer of Deak located in San Francisco. Deak was convicted of 377 misdemeanor violations of the Bank Secrecy Act, 31 U.S.C. §§ 1058 and 1101[1]—failure to report receipt of currency in an amount exceeding $5,000 from outside the United States. Beusch, as responsible corporate officer in the offending transactions, was likewise convicted of the 377 misdemeanors. Both appeal from those convictions, citing to insufficiencies in the search warrant affidavit and excesses in the search which uncovered most of the incriminating evidence. Deak adds to these alleged errors the claim that the evidence was insufficient to sustain a finding of willful violation of § 1101, and the claim that one of the jury instructions given constituted reversible error.

The United States Government also appeals from the dismissal of a four-count felony indictment against Deak and Beusch which charged that the same set of facts alleged in the indictment for the misdemeanors referred to above constituted a pattern of illegal transactions in violation of 31 U.S.C. § 1059.[2]

For reasons discussed more fully below, we affirm the convictions of Deak and Beusch, and we reverse the dismissal of the felony indictment.

The facts show that in 1972, Beusch initiated contact between Deak and two Filipinos—Gimenez and Lai Man—who began sending large amounts of currency to the United States for further disbursal throughout the world. Between 1972 and 1976, approximately $11 million were sent and disbursed. None of the money shipments was reported to the Treasury Department as required by certain provisions of the Bank Secrecy Act, 31 U.S.C. § 1101.

* Hon. Myron H. Bright, U. S. Circuit Judge, Eighth Circuit, sitting by designation.

1. The pertinent portions of § 231 of the Bank Secrecy Act, 84 Stat. 1122, 31 U.S.C. § 1101 (1970), are as follows:

"(a) . . . [W]hoever, whether as principal, agent, or bailee, or by an agent or bailee, knowingly—

(1) transports or causes to be transported monetary instruments—

(A) . . .

(B) to any place within the United States from or through any place outside the United States, or

(2) receives monetary instruments at the termination of their transportation to the United States from or through any place outside the United States

in an amount exceeding $5,000 on any one occasion shall file a report or reports in accordance with subsection (b) of this section."

Section 209 of the Act, 31 U.S.C. § 1058, reads as follows:

"Whoever willfully violates any provision of this chapter or any regulation under this chapter shall be fined not more than $1,000, or imprisoned not more than one year, or both."

2. Section 210 of the Bank Secrecy Act, 84 Stat. 1121, 31 U.S.C. § 1059 (1970) reads as follows:

"Whoever willfully violates any provision of this chapter where the violation is—

(1) committed in furtherance of the commission of any other violation of Federal law, or

(2) committed as part of a pattern of illegal activity involving transactions exceeding $100,000 in any twelve-month period,

shall be fined not more than $500,000 or imprisoned not more than five years, or both."

Sometime in the Spring of 1976, customs agents in Hawaii inadvertently discovered currency in a package sent from the Phillippines to Deak's offices in San Francisco. Suspicions were aroused when customs, postal, and courier records revealed that in the recent past, many similar packages had been sent from the same source to the same address, but Treasury records showed no § 1101 reports. A search warrant was issued and executed in May, 1976, at Deak's offices in San Francisco. Incriminating ledgers, files and packages of money were discovered there. Convictions and these appeals followed.

## I. ISSUES RAISED

A. Did the affidavit in support of the government's application for a warrant to search Deak's San Francisco office show probable cause to believe evidence of violation of the Bank Secrecy Act would be found there?

B. Was the search of Deak's office impermissibly broad, thus requiring suppression of some of the evidence seized?

C. Was the evidence sufficient to sustain a finding that Deak willfully violated the Bank Secrecy Act through the acts of its agent Beusch?

D. Was it reversible error to instruct the jury that a corporation may be liable for the acts of its agents done within the scope of their authority, even though such acts are contrary to either actual instructions or stated corporate policy?

E. Was the district court correct in dismissing the felony indictment on the ground that misdemeanor violations under 31 U.S.C. § 1058 could not be lumped together and constitute felony violations under 31 U.S.C. § 1059?

## II. DISCUSSION

### A. *Sufficiency of the Affidavit*

■ Deak and Beusch argue initially that the affidavit submitted by the Customs agents who sought the warrant to search Deak's offices was insufficient because it did not reveal enough to allow the issuing magistrate to assess the reliability of the

information contained therein. It is apparent from the affidavit that most of the information in it is hearsay; that is, it came from an informant, not from the agents who submitted it. Rule 41, F.R.Crim.P., allows such hearsay to form the basis of probable cause to justify the issuance of the warrant, but it has been judicially determined that there must be "substantial basis for crediting the hearsay." *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). More recently, *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) announced the famous two-pronged test of sufficiency of affidavits based on hearsay. *Accord, Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Rutherford v. Cupp,* 508 F.2d 122 (9th Cir. 1974), *cert. denied,* 421 U.S. 933, 95 S.Ct. 1663, 44 L.Ed.2d 92 (1975). *See United States v. McCrea,* 583 F.2d 1083 (9th Cir. 1978). The test is as follows: First, the affidavit must show some underlying circumstances as to why the informant believed his information was reliable. Second, the affidavit must show some underlying circumstances that would allow the affiant to conclude that the informant was credible. The purpose of these tests is, of course, to provide enough information to a neutral and detached magistrate to allow him to determine for himself whether probable cause to search exists. *Aguilar, supra.* Unless these tests are met, an affidavit based on hearsay is inadequate to show such probable cause. *Id.*

■ All parties concede that the second prong—credibility of the informant—is met in this case. The informant here, one Foster, was identified as a special agent for the U.S. Customs Service, and government investigatory agents are entitled to the presumption of credibility in such circumstances. *See United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Steed,* 465 F.2d 1310 (9th Cir.), *cert. denied,* 409 U.S. 1078, 93 S.Ct. 697, 34 L.Ed.2d 667 (1972).

■ Deak and Beusch contend, however, that because the affidavit does not explain precisely how agent Foster obtained

his information or why he believed it was true, there is no basis for the magistrate's or the district court's conclusion that the information was reliable. Thus, they argue, the affidavit fails to satisfy the first prong of *Aguilar.*

The affidavit here states that the source of agent Foster's information was "certain documents", without directly identifying what those documents were. Deak and Beusch maintain that failure to identify the documents any further is the same as failing to flesh out the reliability of an informant, a defect condemned in *Spinelli, supra.* Indeed, this argument has superficial appeal. Closer scrutiny shows, however, that the two cases are dissimilar in significant ways. In *Spinelli,* the defective affidavit stated only that "the FBI 'has been informed by a confidential reliable informant that William Spinelli is operating a handbook and accepting wagers and disseminating wagering information [by means of certain telephones].'" 393 U.S. at 414, 89 S.Ct. at 588. This bare bones assertion was not substantiated in any acceptable way in the affidavit, which was found to be inadequate. In the present case, on the other hand, the source of the information is identified as "certain documents", and the contents of those documents are summarized in considerable detail. The abundant detail might, by itself, be enough to make this affidavit inherently reliable. *See United States v. Toral,* 536 F.2d 893 (9th Cir. 1976); *United States v. Hamilton,* 490 F.2d 598 (9th Cir.), *cert. denied,* 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974). But other facts make it unnecessary for us to rely solely on the detail evident in the affidavit to uphold its validity.

Other information contained in the affidavit corroborates the information gleaned from those "certain documents", and, in contrast to *Spinelli,*[3] the other information

engenders suspicion. It shows that the description of the money package opened inadvertently in Hawaii matched the descriptions found in those "certain documents" of other packages sent from the Phillippines to Deak offices in San Francisco and Los Angeles. It also shows that no § 1101 reports were filed for money shipments even though Deak employees said they had been. We believe that where allegations, the reliability of which arguably does not satisfy the first prong of *Aguilar,* are corroborated by other information which engenders suspicion, the reliability of such allegations in enhanced. We also hold that on these facts, the information in those "other documents" was thereby shown to be reliable enough to justify a finding of probable cause.

There is a third reason for our conclusion. We have examined the affidavit in question and are persuaded that it shows the "certain documents" to have been postal and customs records. Had the affidavit said as much, there is no question but that the requirements of *Aguilar* and *Spinelli* would have been satisfied. The fact that this was not stated explicitly does not, however, preclude the magistrate or the district court— or us—from inferring as much. While it would have been better for the affiant to include that item of information in the affidavit, this oversight was, at worst, harmless error. Where, as here, the detail and character of the information is such that it allows the magistrate to reasonably infer the identity of its source, the mere failure to identify that source explicitly will not cause the affidavit to become fatally impaled on the first prong of *Aguilar. See generally, United States v. Ventresca,* 380 U.S. at 109–111, 85 S.Ct. 741.

In light of the foregoing, we find no merit to Deak's ancillary argument that the affidavit was not sufficiently specific with

---

**3.** The United States in *Spinelli* argued that other allegations in the affidavit lent credence to the spare reference to the informant information quoted above. The Supreme Court rejected that argument, noting that the other information by itself was totally innocuous—it showed Spinelli drove several times from Illinois to St. Louis, Missouri, and parked near a building containing an apartment with two telephones, albeit the same phones referred to in the tip.

regard to its office in San Francisco [4]—the location of most of the seized evidence. Deak's argument is premised on the conclusion that all of the information from the "other documents" must be ignored. We have rejected that conclusion. To the extent it is argued that even if all the information in the affidavit is considered, there was still no probable cause to search the San Francisco office, we find it likewise without merit. The affidavit shows probable cause.

### B. The Search

A warrant was issued which authorized the search of Deak's San Francisco office for documentary evidence relating to transactions between Deak and Arthur Gimenez, the Filipino whose shipment was intercepted in Hawaii.[5] When the warrant was executed, however, the agents conducting the search seized certain items arguably unrelated to Gimenez which served as the basis for approximately 90% of the misdemeanor counts—items which showed similar unreported shipments from one Lai Man, also a Filipino. Deak and Beusch argue that the warrant did not authorize the search for, or seizure of, these items, and that the agents therefore violated the Fourth Amendment prohibition against seizure of evidence not particularly described in the warrant. This, they contend, requires suppression of the evidence illegally seized, citing as authority a host of cases with which we cannot disagree.[6] Unfortunately for them, the rule against general searches and seizures was not violated here.

■ Deak and Beusch object specifically to the seizure of the following items: (1) a ledger containing all records of "sales and purchases" for a 12-month period beginning on April 1, 1974, (2) a file containing all "1973 incoming cables", and (3) a ledger containing records on foreign customers. It is conceded that all three items contain incriminating evidence regarding the Deak-Gimenez connection. It is likewise reasonably clear from the record that two of the three items—the "sales and purchases" ledger and the "1973 incoming cables" file—were organized in chronological rather than alphabetical order. The foreign customers ledger was organized alphabetically. Deak and Beusch argue that because those portions of the three items dealing with Gimenez were easily identifiable, and because the ledgers and file were easily separable, the searchers' failure to separate them and take only those portions dealing specifically with Gimenez constituted an impermissible general search. We disagree.

■ The two appellants cite no authority for the proposition that pages in a single volume of written material must be separated by searchers so that only those pages which actually contain the evidence sought may be seized. Such a rule would substantially increase the amount of time required to conduct a search, thereby aggravating the intrusiveness of the search. It would conceivably require the use of auditors, bookkeepers and accountants in a documents search such as the one in this case in order to protect against inadvertent seizure of materials outside the scope of the warrant. The alternative which Deak suggests—allowing the custodian of the records to assist in the segregation of the pages—is equally unappealing. The Fourth Amendment incorporates a great many specific

---

4. The affidavit also makes reference to suspected evidence in the offices of both Deak & Co. (Hawaii), Inc., and Deak & Co., Los Angeles, both of which are apparently related to Deak only through Deak & Co. of New York, the parent company.

5. It appears from the Record—and we assume for purposes of this appeal—that the investigation subsequent to the Hawaiian discovery leading up to the search unveiled only information regarding Gimenez.

6. *E. g., Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *United States v. Micheli*, 487 F.2d 429 (1st Cir. 1973).

protections against unreasonable searches and seizures, but it does not confer upon the person subject to a lawful search the right to decide for himself what will and will not be seized. All three items admittedly contained information seizable under the terms of the warrant and they therefore met the particularity requirement of the Fourth Amendment. As long as an item appears, at the time of the search, to contain evidence reasonably related to the purposes of the search, there is no reason—absent some other Fourth Amendment violation—to suppress it. *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The fact that an item seized happens to contain other incriminating information not covered by the terms of the warrant does not compel its suppression, either in whole or in part. In so holding, we are careful to point out that we are discussing single files and single ledgers, i. e., single items which, though theoretically separable, in fact constitute one volume or file folder. The reasons we have given for allowing their seizure may not apply to sets of ledgers or files, but because that is not the case here, we find it unnecessary to discuss it further.

Because we hold that the items seized were covered by the terms of the warrant, we find it unnecessary to deal with the Government's contentions that they were admissible under the "plain view" exception to the warrant requirement, *e. g., Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), or that they were admissible as evidence of similar illegal activity which showed intent in the Gimenez violations, *Louie v. United States*, 426 F.2d 1398 (9th Cir.), *cert. denied*, 400 U.S. 918, 91 S.Ct. 180, 27 L.Ed.2d 158 (1970). *See Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1975).

### C. Willfulness

■ Deak contends that the evidence was insufficient to sustain the finding and conclusion that Beusch acted with the intent to benefit Deak so that the willfulness of his acts as an agent could be imputed to Deak, the principal. The acts of an agent may be imputed to the principal, *New York Central & H. R. R. Co. v. United States*, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613 (1908); *Boise Dodge, Inc. v. United States*, 406 F.2d 771 (1969), but only if it is the agent's purpose to benefit the principal, thus bringing his acts within the scope of his employment. *United States v. Hilton Hotels Corp.*, 467 F.2d 1000 (9th Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973). If intent to benefit is present, then actual benefit is largely irrelevant. *See Standard Oil Co. of Texas v. United States*, 307 F.2d 120 (5th Cir. 1962).

■ One of the investigating agents testified at trial that Beusch told him in an interview that he had acted for Deak and not for himself. Beusch himself did not testify, apparently because of Fifth Amendment considerations. Deak argued at trial, and it continues to argue here, that other evidence showed Beusch was trying to protect the two Filipinos and therefore was not trying to benefit Deak. The jury believed otherwise. There is support for its finding in the Record, and we cannot say that it was clearly erroneous. *Interform v. Mitchell*, 575 F.2d 1270 (9th Cir. 1978).

### D. The Jury Instruction

■ Deak's final contention is that one of the instructions given to the jury prior to its deliberation was erroneous because, in effect, it imposed strict liability on Deak for Beusch's acts in spite of the requirement of specific intent found in 31 U.S.C. § 1058, quoted in full in footnote one in the margin. The challenged instruction reads as follows:

> "A corporation may be responsible for the acts of its agents done or made within the scope of its authority, even though the agent's conduct may be contrary to the corporation's · actual instruction or contrary to the corporation's stated policies."

We have examined all of the instructions related to vicarious responsibility and find

that, read in context,[7] the challenged instruction does not mean what Deak says it means. It does not impose strict liability on Deak without proof of intent. Rather, it suggests that a corporation *may* be liable for acts of its employees done contrary to express instructions and policies, but that the existence of such instructions and policies may be considered in determining whether the employee in fact acted to benefit the corporation. Merely stating or publishing such instructions and policies without diligently enforcing them is not enough to place the acts of an employee who violates them outside the scope of his employment. *See United States v. Armour*, 168 F.2d 342 (3d Cir. 1947). It is a question of fact whether measures taken to enforce corporate policy in this area will adequately insulate the corporation against such acts, and we see no reason to disturb the jury's finding in this regard. The instruction given the jury, read in context, is a proper statement of the law. *See United States v. Hilton Hotels Corp.*, 467 F.2d 1000 (9th Cir. 1973), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973).

### E. *The Felony Indictment*

The government appeals from the dismissal of a felony indictment based on 31 U.S.C. § 1059, quoted in full in footnote two in the margin. The government concedes that subsection (1) of § 1059 does not apply because the facts here show no other violation of federal law, in the furtherance of which the Bank Secrecy Act was also violated. It also concedes that the same money shipments which constituted the acts alleged in the 377 misdemeanor counts were aggregated to form the basis for the four felony counts.

The trial court viewed this attempt to create a few felony charges out of a series of misdemeanors as bootstrapping and dismissed them, citing the legislative history of the Bank Secrecy Act as authority for the proposition that the Act was intended to facilitate the monitoring of currency transfers made in support of criminal activities in other areas.

This is a case of first impression—it is the government's maiden attempt to apply the felony provisions of the Bank Secrecy Act. We believe the trial court has interpreted the Act and its purposes incorrectly, and we therefore reverse the dismissal and remand for further proceedings.

First, the plain language of subsection (2) of § 1059 indicates to us that a series of currency transfers which, by themselves, constitute only misdemeanors, may also constitute felonious activity if they (a) show a *pattern* of illegal activity, and (b) exceed $100,000 over a 12-month period. In contrast to subsection (1) of § 1059, which requires other illegal activity (i. e., activity not involving violations of the Bank Secrecy Act), subsection (2) evidences no similar requirements. We infer, therefore, that a series of misdemeanor violations of the act may, by themselves, call forth the increased penalties of subsection (2).

Second, while the trial court was certainly correct in noting that a major purpose of the Bank Secrecy Act is to aid in the control of white collar and other types of crimes involving transfers of large amounts of money, this is not its sole purpose. With

---

**7.** The other relevant instructions were as follows, and appear in the order in which they were given:

"The acts of a corporate agent or corporation's employee are within the scope of his authority if those acts are done on the corporation's behalf or for its benefit in the performance of the agent's general duties.

"Acts included within the scope of the agent's authority are not only those that have been specifically authorized by the corporation but also those which a reasonable person would reasonably assume such an agent or employee the authority to do. [sic]

. . . [The challenged instruction] . . .

"You may, however, consider the corporate policies and instructions as one of the circumstances along with any other circumstances that you find to be significant in determining what the authority of the agent actually was and whether the agent was acting on behalf of the corporation.

"In order to be acting within the scope of his authority, the employee must be found to be acting on behalf of the corporation with the purpose of benefiting the corporation or serving some corporate purpose."

specific reference to § 1059(2), Congress reported as follows:

> "It should be noted that serious violations under this title may involve very large sums of money, and fines of as much as $10,000 or more might be shrugged off as a mere cost of doing business. To have any real deterrent effect, the potential fine must be large enough to have some real economic impact on potential violators."

H.R.Rep.No.91–975, 91st Cong., 2d Sess. —— (1970), 1970 U.S.Code Cong. & Admin. News, pp. 4394, 4406.

 This suggests to us that Congress intended to impose more severe penalties in cases involving particularly serious violations, whether violations of the Act alone, or violations of the Act in conjunction with some other illegal activity.

 We hold, therefore, that dismissal of the felony indictment was improper. We reverse and remand for further consideration. Our ruling here does not address itself to the factual question of whether the acts which led to the misdemeanor convictions constituted a *pattern* of illegal activity within the meaning of § 1059(2); we hold merely that they could have. The state of the record also persuades us not to reach the question of whether further prosecution would violate the Fifth Amendment prohibition against double jeopardy. It is fairly clear that a § 1058 violation is a lesser included offense of § 1059, and that a conviction under § 1058 would normally preclude later prosecution under § 1059. *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). *See Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). What is not clear is whether Deak's acts in moving for dismissal triggered an exception to the double jeopardy rule (*See Jeffers, supra* ; *Sanabria v. United States,* 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978); *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977)), or whether the government waived its possible opportunity to prosecute by failing to seek from this court a stay of the dismissal and by admitting before the trial court that the double jeopardy clause would bar further prosecution if the misdemeanor offenses were tried separately from the felony charges. We leave resolution of these issues to the trial court.

## CONCLUSION

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

BRIGHT, Circuit Judge, concurring in part, dissenting in part.

While I concur in the affirmance of the misdemeanor convictions of the defendants, Willi Beusch and Deak & Company of California (Deak), I would reject the Government's appeal. The Government, unsatisfied with obtaining 377 misdemeanor convictions against defendants, requests reinstatement of a four-count felony indictment dismissed by the district court.

The felony charges arose out of the same conduct as the misdemeanor charges—the willful failure of Deak and Beusch, on 377 occasions, to report their receipt of currency exceeding $5,000 from outside the United States. Such conduct violates the foreign financial transaction reporting requirements of section 231 of the Bank Secrecy Act of 1970 (the Act) and clearly amounts to misdemeanor offenses under 31 U.S.C. § 1058 (1976).[1] The Government contends that these reporting violations, which involved transactions totaling more than $100,000 in each of four twelve-month periods, may be aggregated to form four felony violations "committed *as part of a pattern*

---

1. Section 231 of the Act, 31 U.S.C. § 1101, requires anyone connected with the transportation into or out of the United States of "monetary instruments" (including currency) exceeding $5,000 on any one occasion to report such transaction to the Secretary of the Treasury, in a manner prescribed by the Secretary's regulations. Under 31 U.S.C. § 1058, willful violations of the reporting requirements of section 231 are misdemeanors, punishable by a fine not exceeding $1,000 or imprisonment not longer than one year for each offense.

*of illegal activity* involving transactions exceeding $100,000 in a twelve-month period." 31 U.S.C. § 1059(2) (1976) (emphasis added).

A reading of the statute in light of the statutory history convinces me, contrary to the majority view, that several reporting violations constitute several misdemeanors and nothing more when, as in this case, the violations are unrelated to any other type of activity that might be considered illegal.

The felony statute which the Government seeks to apply here reads:

§ 1059. Additional criminal penalty in certain cases

Whoever willfully violates any provision of this chapter where the violation is—

(1) committed in furtherance of the commission of any other violation of Federal law, or

(2) committed as part of a pattern of illegal activity involving transactions exceeding $100,000 in any twelve-month period,

shall be fined not more than $500,000 or imprisoned not more than five years, or both.

According to the Government's theory, repeated violations of a "provision of this chapter," standing alone, may amount to "a pattern of illegal activity" under subdivision (2).

In my view, however, subdivision (2) should be read as parallel in construction to subdivision (1), which calls for felony penalties where reporting violations are committed "*in furtherance of the commission of* any other violation of Federal law" (emphasis added). An ordinary reading of subdivision (2) demonstrates an intention to impose felony sanctions where the reporting violations serve "as *part* of a pattern of illegal activity." The other "parts" of such a pattern of illegal activity might include, for example, violations of state law, local ordinances, or state regulations. In any event, it appears that, just as subdivision (1) requires a connection between the reporting violation and some "other violation of Federal law," subdivision (2) applies only where a reporting violation is tied to other activity which is independently "illegal."

Such a reading of subdivision (2) is consistent with the legislative history. Congress enacted the foreign financial transaction reporting requirements of the Act in response to considerable testimony that

[s]ecret foreign bank accounts and secret foreign financial institutions have permitted proliferation of "white collar" crime; have served as the financial underpinning of organized criminal operations in the United States; have been utilized by Americans to evade income taxes, conceal assets illegally and purchase gold; have allowed Americans and others to avoid the law and regulations governing securities and exchanges; have served as essential ingredients in frauds including schemes to defraud the United States; have served as the ultimate depository of black market proceeds from Vietnam; have served as a source of questionable financing for conglomerate and other corporate stock acquisitions, mergers and takeovers; have covered conspiracies to steal from U.S. defense and foreign aid funds; and have served as the cleansing agent for "hot" or illegally obtained monies. [H.R.Rep.No.91–975, 91st Cong., 2d Sess., at ——, 1970 U.S.Code Cong. & Admin.News, pp. 4394, 4397.]

Although all imports and exports of large sums of money must be reported under the Act, information concerning *legitimate* banking transactions—*i. e.*, those unrelated to illegal activities—does not represent the congressional goal. Rather, the express purpose of the Act is

to require certain reports or records where such reports or records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings. [31 U.S.C. § 1051 (1976).]

*See California Bankers Assn. v. Schultz*, 416 U.S. 21, 26–28, 35, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974).

As the majority observes, Congress intended the felony provisions of 31 U.S.C. § 1059 to impose a severe penalty upon "serious violations" in order to deter potential violators. That expression of intent, however, does not justify the conclusion that, for deterrence purposes, the failure to

report otherwise lawful transactions, conduct ordinarily treated as a minor misdemeanor violation, should be converted into a felony because of repetition.[2]

Congress enacted a wide range of penalties, apart from the felony statute, for violations of the Act's reporting provisions. For *any* violation the Secretary of the Treasury may assess a civil penalty in an amount not exceeding the value of the transported money instruments for which a report was required. 31 U.S.C. § 1103.[3] Willful violators are subject to an additional civil penalty of up to $1,000 per violation, 31 U.S.C. § 1056, or to criminal prosecution and punishment by a fine not exceeding $1,000 or imprisonment not longer than one year for each offense, 31 U.S.C. § 1058. Thus, no need exists in the statutory scheme to extend the reach of the felony provisions to encompass a series of acts, each expressly defined as a misdemeanor.

For the 377 violations charged as misdemeanors, each defendant faced an aggregate fine of $377,000, and Beusch faced a possible sentence of 377 years' imprisonment—a substantial deterrent without resorting to the strained reading of the statute sought by the Government.[4]

As the majority notes, this is the Government's "maiden attempt" to apply 31 U.S.C. § 1059. Such a criminal statute of uncertain scope calls for a strict construction and leniency in application.

It has long been settled that "penal statutes are to be construed strictly," *Federal Communications Comm'n v. American Broadcasting Co.*, 347 U.S. 284, 296, [74 S.Ct. 593, 98 L.Ed. 699] and that one "is not to be subjected to a penalty unless the words of the statute plainly impose it," *Keppel v. Tiffin Savings Bank*, 197

U.S. 356, 362 [25 S.Ct. 443, 49 L.Ed. 790]. "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221–222 [73 S.Ct. 227, 229, 97 L.Ed. 260]. [*United States v. Campos-Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971).] *See United States v. Bass*, 404 U.S. 336, 347–48, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

For the foregoing reasons, I dissent from the majority's expansive reading of the pertinent felony provision, 31 U.S.C. § 1059(2).

2. The isolated statement from the legislative history relied upon by the majority, *see* pp. 878–879 *supra*, is at least equally consistent with the view that, by "serious violations," Congress meant violations connected with other federal crimes or with some other activity which is illegal apart from the reporting violation and which may be motivated by the extraordinary profits derived from such illegal activity.

3. In addition, 31 U.S.C. § 1102 provides that any monetary instruments in the process of transportation, with respect to which a report required by § 231 of the Act has not been filed or contains material omissions, is subject to seizure and forfeiture to the United States.

4. The district court apparently considered a modest fine a sufficient deterrent in this case, as it fined Beusch and Deak $5,000 and $20,000, respectively, for the 377 misdemeanor violations.