O’SCANNLAIN, Circuit Judge.
We must decide whether the United States may retain evidence it seized from Major League Baseball’s drug testing administrator (and enforce an additional subpoena) as part of an ongoing grand jury investigation into illegal steroid use by professional athletes.
I
These three consolidated cases arise from the federal investigation of the Bay Area Lab Cooperative (“Baleo”) and its alleged distribution of illegal steroids to professional baseball athletes. The investigation began in August 2002 and, over *920 the following several years, produced evidence — including grand jury testimony' — • establishing probable cause to believe that at least ten major league baseball players received illegal steroids from Baleo. Today we decide the government’s appeals from the separate adverse orders of three different district courts: (1) an order by Judge Florence-Marie Cooper in the Central District of California, requiring the government to return property seized from Comprehensive Drug Testing, Inc. in Long Beach, California (“CDT”),[1] (2) an order by Judge James Mahan in the District of Nevada, requiring the government to return property seized from Quest Diagnostics, Inc. in Las Vegas, Nevada (“Quest”),[2] and (3) an order by Judge Susan Illston in the Northern District of California, quashing the government’s May 6, 2004, subpoenas to CDT and Quest that related to the grand jury sitting in San Francisco, California.
A
As part of its investigation into Baleo, the government in November 2003 served a grand jury subpoena on Major League Baseball (“MLB”),[3] seeking drug testing information for eleven players [4] with connections to Baleo. One month later, MLB responded that it had no such information.
The government then reasoned that because CDT[5] and Quest[6] had tested urine samples from MLB players during 2003, those entities — rather than MLB — had to possess the samples and testing records in question. Therefore, the government issued subpoenas both to CDT and to Quest, seeking drug testing information for all MLB players. The subpoenas were returnable on February 5, 2004, but the government extended that date to March 4, 2004, after CDT and Quest promised not to destroy or to alter any of the evidence requested.
Despite protracted negotiations, CDT and Quest resisted producing any of the subpoenaed materials, explaining that they would fight production of even a single drug test all the way to the Supreme Court. Following further negotiations, the government, believing that a narrower subpoena might be effective, issued new subpoenas on March 3, 2004, seeking documents related only to eleven[7] players with *921 Baleo connections. These new subpoenas were returnable on April 8, 2004.
Two days before the new return date, the Major League Baseball Players’ Association — the union representing athletes who play for Major League Baseball[8]— informed the government that it intended to file a motion to quash the subpoenas. The following day, as promised, CDT and the Players’ Association filed such a motion in the Northern District of California before United States District Judge Jeffrey White.
B
After learning of the planned motion to quash, the government applied on April 7 and April 8, 2004, for warrants to search CDT’s Long Beach office and Quest’s Las Vegas laboratory. Magistrate Judge Jeffrey Johnson issued a search warrant for the office in his jurisdiction, the Central District of California, and Magistrate Judge Lawrence Leavitt issued a search warrant for the laboratory in his jurisdiction, the District of Nevada.[9] Affidavits submitted to support the warrants noted that the information sought was already the subject of grand jury subpoenas and that a motion to quash was expected.[10] Contrary to appellee’s arguments, the government never claimed in its affidavits that any evidence was in danger of being destroyed.[11]
The April 7 and April 8 warrants authorized the seizure of drug test records and specimens for ten named Balco-connected players, as well as “[a]ll manuals, pamphlets, booklets, contracts, agreements and any other materials detailing or explaining” CDT’s or Quest’s “administration of Major League Baseball’s drug testing program.” [12] The warrants also authorized the search of computer equipment, computer storage devices, and — where an on-site search would be impracticable — seizure of either a copy of all data or the computer equipment itself. “[L]aw enforcement personnel trained in searching and seizing computer data” (designated “computer personnel”) were responsible for choosing the appropriate course of action to capture the electronic data sought. If seizure of all data or equipment was necessary, “appropriately trained personnel” would review the data, retaining the evidence authorized by the warrant and designating the remainder for return.
On the morning of April 8, 2004, Special Agent Jeff Novitzky (the lead case agent) *922 and eleven other federal agents — including Computer Investigative Specialist Agent Joseph Abboud — executed the search warrant for CDT’s Long Beach office. Although CDT personnel were initially cooperative, one of CDT’s directors — after speaking with counsel — informed Agent Novitzky that CDT would not assist federal officers in locating the evidence they were authorized to seize and that the agents should “do what they needed to do.” When informed that agents might be forced to seize all computer equipment for up to sixty days, the director again contacted counsel, exclaiming that such a seizure would “shut[] the business down.”
Throughout the morning and early afternoon, Agent Novitzky spoke several times with CDT’s attorney, David Bancroft. Bancroft asked Agent Novitzky not to seize anything while he attempted to work out a beneficial solution with the United States Attorney’s Office in San Francisco. Later, Bancroft told the agent that CDT had only one hardcopy document eligible for seizure. Around noon, both Agent Novitzky and Assistant United States Attorney Jeff Nedrow spoke with Bancroft and CDT’s directors via conference call. Bancroft emphasized that any help CDT provided should not be construed to constitute consent and then informed Nedrow and Agent Novitzky that CDT had two computers on which agents would find information relevant to the search warrant.
During this conference call, Agent No-vitzky learned that agents had discovered a hard-copy document with names and identifying numbers for all MLB players, including some of the ten named Baleo players. Agent Novitzky faxed the document, which was not the “only document eligible for seizure” to which Bancroft had alluded, to Nedrow for preparation of another search warrant to seize specimen samples from Quest based on the identifying numbers.[13] One of CDT’s directors became visibly upset when she noticed the document being faxed. She left the premises, but when she returned, she opened a locked drawer and presented agents with a document that contained drug testing results for the ten named Baleo players — the document previously described as the only seizable hard-copy document on site.[14]
At 2:35 p.m., a CDT director finally identified a computer directory containing all of the computer files for CDT’s sports drug testing programs. This directory, labeled by its original compiler as the “Tracey” directory, contained numerous subdirectories and hundreds of files. Seeing this, Agent Abboud recommended copying the entire directory for off-site analysis, because of the time and intrusiveness involved in searching the voluminous directory on site. Knowing that the warrant required them to rely upon the advice of a computer analyst — here the advice of Computer Investigative Specialist Agent *923 Joseph Abboud — agents copied the directory and removed the copy for later review at government offices.
The search of the CDT facility concluded shortly after 5 p.m., but before he left the premises, Agent Novitzky reviewed with CDT directors the evidence seized during the search. The documents seized included a twenty-five-page master list of all MLB players tested during the 2003 season and a thirty-four-page list of positive drug testing results for eight of the ten named Baleo players, intermingled with positive results for twenty-six other players.[15]
c
Upon returning to his office in San Jose, California, Agent Novitzky briefly reviewed the contents of the Tracey Directory, identifying five subdirectories related to MLB. Within these directories, Agent Novitzky identified files authorized by magistrate judges for seizure, including the master file of positive drug test results.[16] On April 26, 2004, the Players’ Association filed motions under Federal Rule of Criminal Procedure 41(g)[17] seeking return of the property seized.
On May 5, using information culled from the Tracey Directory, the government ap *924 plied for new search warrants to seize all specimens and records relating to the over-one hundred non-Balco players who had tested positive for steroids. Magistrate Judge Leavitt in the District of Nevada authorized seizure of the specimens from Quest, and Magistrate Judge Rosalyn M. Chapman in the Central District of California authorized the seizure of records from CDT. Again, the government sought and obtained each warrant from the district court whose jurisdiction encompassed the situs of the property to be searched, as directed by Fed.R.Crim.P. 41(b).[18] The government executed the warrants on May 6, and the Players’ Association immediately filed Fed.R.Crim.P. 41(g) motions seeking return of the specimens and records seized.
On August 19, 2004, Judge Mahan granted the Fed.R.Crim.P. 41(g) motion brought by the Players’ Association in the District of Nevada and ordered the government to return all specimens seized from Quest and all notes and memoranda compiled by agents who reviewed the evidence, other than those pertaining to the ten Baleo players named in the original search warrant.[19] He made findings— without conducting an evidentiary hearing — that “[tjhe government callously disregarded the affected players’ constitutional rights” and that the government unreasonably refused “to follow the procedures set forth in United States v. Tamura, 694 F.2d 591 (9th Cir.1982),” with regard to the intermingled records. Almost six weeks later, and again without conducting an evidentiary hearing, Judge Cooper rejected the government’s suggestion that the documents were seizable under the warrant exception that applies to plain-view evidence of contraband,[20] and granted the Players’ Association’s Fed. R.Crim.P. 41(g) motion in the Central District of California. The order, which also cited the government’s failure to follow Tamara’s procedures, mandated return to CDT of any evidence seized that was not connected to the ten players named in the warrant. Judge Cooper denied the government’s motion for reconsideration of this order on February 9, 2005.
These orders are the subjects of two of the appeals consolidated here.
D
The third appeal concerns grand jury subpoenas issued to Quest and CDT on May 6, 2004, which were to be returned by June 10, 2004. These subpoenas reached all specimens and records of positive steroid drug tests for more than one hundred MLB players, not simply the results for the ten Baleo players named in the earlier subpoenas.[21] This evidence was also pur *925 sued in the government’s May 5 search warrants. The government sought these later search warrants and subpoenas on the ground that the April 8 seizures did not provide all information needed for the investigation.[22]
Quest complied with the May 6 subpoena, providing the government with hundreds of pages of documents, but the government agreed to defer CDT’s compliance pending resolution of the search warrant litigation. On August 31, 2004, however, the government revoked the indefinite deferral and instructed CDT to comply with the subpoena by September 14, 2004. The Players’ Association filed a motion to quash the subpoenas on September 13, 2004.
In December 2004, after Judge Illston heard argument on the motion but took no testimony, she found that the government’s conduct was unreasonable and constituted harassment. She then filed an order quashing the subpoenas, which the government timely appealed.

lí

Before we review the orders granting the Fed.R.Crim.P. 41(g) motions in the Central District of California and the District of Nevada, we must decide two jurisdictional issues: whether the Players’ Association has standing to challenge the search and seizure of evidence from Quest and whether the government timely appealed Judge Cooper’s order to return the materials seized from CDT in the Central District of California.[23]
A
The government contends that the Players’ Association lacks standing to file the Fed.R.Crim.P. 41(g) motion, because it lacked access, control, and ownership over the records and specimens seized from Quest. Furthermore, it argues that the Players’ Association may not base its interest in the property (the urine specimens and test results) on the privacy interests of the individual players.[24]
*926 An association has standing to sue on behalf of its members when they would otherwise have independent standing to sue, the interests sought to be protected are germane to the organization’s purpose, and the claim asserted does not require the participation of individual members in the lawsuit. Pennell v. City of San Jose, 485 U.S. 1, 7 n. 3, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (citations omitted); see also Hunt v. Wash. Apple Adver. Comm’n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
We are satisfied that the Players’ Association satisfies each prong of this test. First, the Players’ Association represents all MLB players, each one of whom could certainly sue in his own right to seek return of his own drug test records. Second, the interests sought to be protected— the players’ privacy interests in their drug testing records — are related to the organization’s sole purpose: to represent the best interests of MLB players. Third, the Players’ Association sought only the return of the players’ drug testing information and specimens; for this type of prospective relief, the individual players need not be a party to the action. See Warth v. Seldin, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (holding that an association lacked standing where it sought damages rather than “a declaration, injunction, or some other form of prospective relief’).
We therefore conclude that the Players’ Association has standing to assert the Fourth Amendment rights of its members and to file Fed.R.Crim.P. 41(g) motions seeking return of seized property in which their members hold privacy interests.
B
The Players’ Association, for its part, contends that the government failed to appeal in a timely manner Judge Cooper’s order for the return of property. In order to be timely when the United States, its officer, or its agency is a party, a notice of appeal must be filed “within 60 days after the judgment or order appealed from [was] entered.” Fed. R.App. P. 4(a)(1)(B). Where a district court entertains a motion for reconsideration, the 60-day period is tolled until the motion is decided. See Scott v. Younger, 739 F.2d 1464, 1467 (9th Cir.1984) (noting that a timely filed motion “tolls the running of the time limitations for filing the notice of appeal until the district court rules on the motion”).
The “United States’ Motion for Reconsideration and Modification of Court’s October 1, 2004 Order Granting Return of Property” was filed on November 19, 2004. In its opposition to that motion, the Players’ Association stated that the “government neither invoke[d] nor satisfie[d] any of the requirements of Local Rule 7-18 [‘Motion for Reconsideration’] to support its request for reconsideration.” The ap-pellees’ reply brief suggests that the motion was merely “styled as one for reconsideration,” and does not actually qualify as such because the motion only “asked the court to water down its findings” without claiming that “the Court failed to evaluate the merits.”
We disagree. Like the dissent, we believe the motion was properly construed as one for reconsideration. Unlike the dissent, however, we apply the local rule governing motions for reconsideration, and do not recharacterize the motion as a request for “Relief from Judgment or Order” under Fed.R.Civ.P. 60(b) (“Rule 60(b)”).
The motion falls squarely within the definition of a “Motion for Reconsideration” under C.D. Cal. Local R. 7-18 (“Local Rule 7-18”). Judge Cooper recognized this when she chose to analyze the motion under Local Rule 7-18. This analysis was proper, for Local Rule 7-18 permits a par *927 ty to bring a “Motion for Reconsideration” on the basis of a “manifest showing of a failure to consider material facts presented to the Court before such decision.” C.D. Cal. Local R. 7-18(e). The government made its motion on precisely these grounds.
The dissent agrees that Local Rule 7-18 applies to such motions, and correctly notes that the “Federal Rules of Civil Procedure do not provide for Motions for Reconsideration.’” Dissent at 19858. Instead, “such motions are creatures of local rule or practice.” Id. The dissent then points out a caveat: “Where a conflict arises between the two, federal rules must prevail.” Id. (citations omitted). From this point, the dissent draws a far more sweeping conclusion: “For the purposes of appeal, when a local rule based post-judgment motion for reconsideration is made, we construe it either as (1) a motion to alter or amend a judgment under Rule 59(e) or (2) a motion filed under 60(b) for relief from judgment.” Dissent at 19859 (citing Am. Ironworks & Erectors v. N. Am. Constr. Corp., 248 F.3d 892, 898-99 (9th Cir.2001)). So broad a conclusion is not justified. Am. Ironworks does not even mention a local rule in its discussion of Rule 59(e) or Rule 60(b). The case simply addresses which federal rule to apply to a motion not already treated as a motion for reconsideration under a local rule.
Even more problematically, the dissent places the cart before the horse by assuming an inconsistency between the federal and local rules before stating which federal rule even applies.[25] We decline so hastily to dispose of a local rule. “Local rules are ‘laws of the United States,’ ” Marshall v. Gates, 44 F.3d 722 (9th Cir.1995) (quoting United States v. Hvass, 355 U.S. 570, 575, 78 S.Ct. 501, 2 L.Ed.2d 496 (1958)), and “valid if ... ‘not inconsistent’ with the Federal Rules of Civil Procedure,’ ” id. (citing Fed.R.Civ.P. 83). Unlike the dissent, we look to the text of the rules in order to discern whether such an inconsistency exists. Rule 60(b) reads:
On motion and upon such terms as are just, the court may relieve a party or a party’s legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.
Fed.R.Civ.P. 60(b). In contrast, Local Rule 7-18 provides:
A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party mov *928 ing for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.
C.D. Cal. Local R. 7-18 (emphasis added). The government’s motion clearly falls under Local Rule 7-18(c), because, as the dissent points out, the government “assert[ed] that the court had ignored evidence and arguments.” Dissent at 19863. In contrast, the motion does not fall within Rule 60(b), for the government did not request relief “from the operation of the judgment” but simply and expressly asked the court to “reconsider and modify several aspects of this order which inaccurately characterize the government’s actions.”[26]
The government neither requested Rule 60(b) relief nor cited the grounds for such relief, which include “mistake, inadvertence, surprise, or excusable neglect,” “newly discovered evidence,” “fraud ... misrepresentation, or other misconduct of an adverse party, a change in the binding nature of the judgment, or ‘any other reason justifying relief from the operation of the judgment.’ ” Fed.R.Civ.P. 60(b)(l)-(6). In the absence of a clear inconsistency between the local and federal rules, we will not apply a general federal rule where a specific local rule is directly on point. As the dissent aptly points out, “[w]e are ... under an obligation to construe local rules so that they do not conflict with the federal rules, and we have exercised our ingenuity in doing so.” Marshall, 44 F.3d at 725.[27]
Satisfied that the district court correctly analyzed the motion under Local Rule 7-18, we turn to its timeliness, in order to decide whether it tolled the period to file an appeal. Local Rule 7-18 does not expressly set a time frame in which to file a motion for reconsideration. However, the rule has been read to “provid[e] for a reasonable time within which to seek reconsideration.” Meredith v. Erath, 2001 WL 1729626, *1 (C.D.Cal.) (Cooper, J.) (defining the relevant period for filing a “Motion for Reconsideration” under then-C.D. Cal. Local R. 7-16, the same rule now codified as C.D. Local R. 7-18). In Meredith, the district judge — the same Judge Cooper whose order is appealed here— found that an eleven-month delay in filing a motion for reconsideration was unreasonable, making the motion untimely under Local Rule 7-18. Id. In contrast, Judge Cooper did not conclude that the two-month delay in the motion here was unreasonable and did not view the government’s motion in this case as untimely (although the government advised her that it had filed “outside of the normal time frame”). We agree with her determination that the shorter delay here was reasonable. One factor supporting its “reasonableness” is that neither the government nor the mov- *929 ants received the order until November 2, 2004. Given these circumstances, we do not believe Judge Cooper’s decision to hear the motion was impermissible under the “reasonable time” period permitted under Local Rule 7-18. See Meredith, 2001 WL 1729626, at *1.
Thus, we are satisfied that the motion for reconsideration was timely filed. Judge Cooper denied the motion on February 9, 2005, tolling the deadline for any appeal until April 9, 2005. The government filed its appeal on March 9, 2005, with thirty days remaining before the filing deadline. The timely nature of that appeal, and of the motion for reconsideration before it, gives us jurisdiction to consider the original order.[28]
Ill
The government contends that Judge Cooper and Judge Mahan improperly exercised equitable discretion to hear and to grant the respective Fed.R.Crim.P. 41(g) motions[29]
A district court may exercise equitable jurisdiction to hear such motions only after analyzing the four factors set out in Ramsden v. United States, 2 F.3d 322 (9th Cir.1993). Specifically, the court must consider
1) whether the Government displayed a callous disregard for the constitutional rights of the movant; 2) whether the movant has an individual interest in and need for the property he wants returned; 3) whether the movant would be irreparably injured by denying return of the property; and 4) whether the mov-ant has an adequate remedy at law for the redress of his grievance.
Id. at 325. Both district courts here found that all four factors weighed in favor of equitable jurisdiction.
Because the government now concedes that the parties have no adequate remedy at law, we only need to discuss the first three Ramsden factors.
A
Interestingly, the Players’ Association does not challenge the validity of the warrants authorizing the April 8 searches. Thus, we assume that probable cause existed to support issuance of the search warrants for the property to be seized from the places named in each warrant. Nevertheless, the Players’ Association defends the grant of its motions for return of property, arguing that the government acted in callous disregard of the Fourth Amendment rights of the Players’ Association, the MLB players, and CDT, offering a farrago of arguments to that end. We consider each in turn.
1
The Players’ Association first argues that the government sought search *930 warrants in an attempt to avoid judicial review of the overbroad January 2004 subpoenas. We are aware of no authority that the simultaneous pursuit of search warrants and subpoenas in aid of an ongoing grand jury investigation constitutes a violation of the Fourth Amendment. Neither can we accept that the government could not have obtained and executed a search warrant had the January subpoenas been quashed. The government argues— and we have previously recognized — that subpoenas and search warrants are not the same. See In re Grand Jury Subpoenas Dated December 10, 1987, 926 F.2d 847, 854 (9th Cir.1991); see also infra Section V. Unlike a subpoena, a search warrant may be obtained only upon a showing of probable cause — a burden the government sometimes considers necessary to establish in order to obtain certain production of evidence.[30] In contrast, a grand jury subpoena may issue simply because an Assistant United States Attorney believes the evidence may assist the grand jury in furthering the progress of an ongoing investigation which may never establish probable cause to charge anyone. The “[grand jury] ... has the right to every man’s evidence,” United States v. Calandra, 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (internal quotation marks omitted; second alteration in original), and an indictment may be obtained even on the basis of illegally seized evidence. Id. at 351-52, 94 S.Ct. 613. In any event, persons aggrieved later may litigate the seizure and subsequent use of the evidence, as provided in the Federal Rules of Criminal Procedure. We fail to see how the government’s compliance with the procedural and evidentiary burdens necessary to obtain a search warrant from a neutral and detached magistrate can be interpreted as callous disregard of the Fourth Amendment.
2
Next, the Players’ Association accuses the government of making “misleading representations” in applying for the search warrants. In her October 1 order, Judge Cooper accepted this argument, finding that:
[I]n seeking the warrant (not the correct procedure for obtaining documents from a third party who is not a suspect), the Government explained to the Magistrate that the records in question were in danger of being destroyed. This is a blatant misrepresentation, as demonstrated by the records in this case.
Unfortunately, Judge Cooper’s conclusion misstates established Fourth Amendment jurisprudence,[31] under which “valid war *931 rants may be issued to search any property, whether or not occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found.” Zurcher v. Stanford Daily, 436 U.S. 547, 554, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).
More importantly, Judge Cooper’s finding derives no support from the record. Magistrate Judge Johnson expressly found to the contrary, and neither judge heard any evidence from witnesses as the Player’s Association had urged. In applying for the search warrants in this case, the government never informed any judge that evidence was in danger of being destroyed. Remarkably, despite its submission of fourteen volumes of supplemental excerpts of record, the Players’ Association provides only a solitary citation to show such “blatant misrepresentation.” Tellingly, the only arguable allusion to destruction of evidence is found in the government’s opposition to the Players’ Association’s Fed. R.Crim.P. 41(g) motion' — made after execution of the search warrants, not to obtain them. There, the government retrospectively explained that it “had good-faith reasons to believe that CDT was detrimentally delaying the investigation, and that there was some danger of the availability of the sought-after records being jeopardized.” The government never suggested this concern as a reason for any court to grant a search warrant in the first place. The district court’s finding to the contrary was clearly erroneous.
The Players’ Association also accuses the government of repeatedly failing to inform judges from whom search warrants were obtained that CDT was seeking to quash the subpoena. The dissent accepts this argument and paints a picture of deliberate concealment. Unfortunately, this picture is not supported by the record. The dissent contends that “[t]he government never brought to the magistrate judge’s attention that there was a motion pending in the Northern District of California to quash the grand jury subpoena.” Dissent at 19836. However, in his search warrant affidavit filed on April 7, 2004, Agent Novitsky expressly advised the court that “CDT has declined to comply with the [March 3 grand jury] subpoena and has stated its intent to attempt to quash the subpoena.”
The government had no reason to refer to a pending motion to quash the grand jury subpoena, as no such motion was filed prior to April 7, 2004. Indeed, Agent No-vitsky filed for the search warrant in the Central District on the same day that CDT moved to quash the grand jury subpoena in the Northern District.[32] Parties must reveal relevant facts, but they are not required to be prophetic.
The record reflects similar candor. on the part of government agents in the District of Nevada, where the government submitted affidavits for a search warrant also on April 7. There, too, the government advised the court of the existing subpoena as well as Quest’s intention “to move to quash the subpoena.” Alerted to the impending motion to quash, Judge Leavitt noted the date when the motion ultimately was filed.[33] As in the Central District of California, the record contradicts any suggestion that the government failed to reveal a pending motion to quash.
*932 3
The Players’ Association next argues that the government used the search warrants for the records of the ten named Baleo players as a pretext to seize the records of other MLB players. In support, they cite United States v. Rettig, 589 F.2d 418 (9th Cir.1978), where the police obtained a warrant for marijuana paraphernalia after failing a day earlier to obtain a warrant to search for evidence of a cocaine smuggling conspiracy. Id. at 422-23. During the ensuing search, officers told the suspect’s wife to “tell us where [the cocaine] is so we don’t have to mess up your house.” Id. at 422 n. 1.
Such egregious police misconduct did not occur here. Agents executing the warrant at CDT were authorized to seize the drug testing records of the ten named Baleo players. In their lawful search for those records, they found paper and electronic data related to those players, intermingled with data pertaining to additional MLB players not mentioned in the search warrant. One document, at issue here, was a spreadsheet of positive drug test results, where results for eight of the ten named Baleo players were intermingled with results for other MLB players. Because the agents saw that the spreadsheet clearly contained information within the scope of the warrant, they seized the spreadsheet for off-site review.
The record contains no support for the assertion that agents specifically targeted and seized records unrelated to the players mentioned in the search warrant. To the contrary, the agents narrowed their seizures to files containing information on the named Baleo players, and during the May 6 search at Quest, they seized specimens belonging only to the ten Baleo players. Finally, the agents copied relevant files in order to avoid an excessively long and intrusive on-site search, although duplication risked the loss of deleted documents that would only be visible on the original drives.
We see no evidence of bad faith or pretext here.
4
Nor does the seizure of intermingled documents demonstrate “a callous disregard for the constitutional rights of the movant.” Ramsden, 2 F.3d at 325 (stating the first factor weighing in favor of equitable jurisdiction over a motion for return of property). In this analysis, we focus on the Fourth Amendment and note that “[a]s always under the Fourth Amendment, the standard is reasonableness.” United States v. Hill, 322 F.Supp.2d 1081, 1088 (C.D.Cal.2004) (Kozinski, Circuit J., sitting by designation). Reasonableness can be especially difficult to define in the computer context, given the well-known “difficulties of examining and separating electronic media at the scene.” Hill, 322 F.Supp.2d at 1090. Fortunately, our prior precedent reveals that agents can avoid the opposing errors of leaving behind essential information and sweeping up excessive evidence.
In United States v. Beusch, 596 F.2d 871 (9th Cir.1979), this court addressed a motion to suppress seized evidence consisting of ledgers containing items covered by the search warrant intermingled with items not covered by the search warrant. Id. at 876-77. The Beusch court concluded that no Fourth Amendment violation occurred when agents seized “single files and single ledgers, i.e., single items which, though theoretically separable, in fact constitute one volume or file folder.” Id. at 877.
The Beusch court expressly limited its reach, however: “[T]he reasons we have given for allowing[such] seizure may not apply to sets of ledgers or files, but be *933 cause that is not the case here, we find it unnecessary to discuss it further.” Id. Three years later, the court addressed the seizure of sets of files. See Tamura, 694 F.2d 591. In Tamura, the court reviewed the conduct of officers executing a search warrant, which authorized seizure of three specific categories of records from a Los Angeles office. Id. at 594. In that case, agents seized — without any limiting effort — files unrelated to the items mentioned in the search warrant. Id. at 595. The Tamura court condemned such “wholesale seizure for later detailed examination of records not described in a warrant.” Id.
Unfortunately, the Tamura court did not answer a more difficult question: “Because seizable materials are seldom found neatly separated from their non-seizable counterparts, how much separating must police do at the scene to avoid taking items that are neither contraband nor evidence of criminal activity?” Hill, 322 F.Supp.2d at 1088. As the Hill court noted, the answer turns upon “reasonableness,” id., a standard that offers little guidance to government agents. Understandably, the Ta-mura court sought to give more concrete advice to help agents remain within the bounds of the Fourth Amendment. The court suggested:
In the comparatively rare instances where documents are so intermingled that they cannot feasibly be sorted on site, we suggest that the Government and law enforcement officials generally can avoid violating fourth amendment rights by sealing and holding the documents pending approval by a magistrate of a further search, in accordance with the procedures set forth in the American Law Institute’s Model Code of Pre-Ar-raignment Procedure.
Tamura, 694 F.2d at 595-96 (emphasis added). Given that the Tamura court found that the agents had violated Fourth Amendment rights by making a “wholesale seizure,” id. at 595, this alternative, protective approach was advisory dicta in that case. See Hill, 322 F.Supp.2d at 1090 (noting that after the Tamura court “held that the government’s wholesale seizure of company documents was illegal because the agents intentionally seized materials they knew were not covered by the warrant ... the Tamura court suggested, albeit in dicta, that [for such seizure of all computer storage media] a warrant would be appropriate.” (emphasis added)).[34]
The Tamura court also stated that substitute protective procedures could be specified in a search warrant, pursuant to which “all items in a set of files may be inspected during a search.” Id. at 595 (emphasis added). In the cases at bar, the search warrants spelled out such specific procedures that the agents were to follow. We believe that the agents in the cases at bar complied with the procedures specified in the warrant:
Upon searching the premises, law enforcement personnel trained in searching and seizing computer data (the “computer personnel”) ... [to] make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.
If the computer personnel determine that it is not practical to perform an on-site search or make an on-site copy of *934 the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.
The government executed the warrant under the guidance of Agent Abboud' — a Computer Investigative Specialist,[35] and took care to avoid unreasonable seizures.
Even so, the Players’ Association contends that the government breached the warrant’s protocol, because Agent Novitz-ky opened and viewed the contents of the Tracey Directory, rather than leaving Agent Abboud to search alone. Under this view, only Agent Abboud qualified as the “appropriately trained personnel” and no other agent had authority to open and to view CDT computer data. However, the plain language of the search warrant does not exclude the assistance of other law enforcement officers — especially for tasks involving non-digital work (such as seeking cooperation from persons on site). The warrant only required that computer personnel assess the possibility of on site search completion. It did not preclude others from assisting the computer personnel.[36] The sort of assistance provided by Agent Novitzky, a nonspecialized law enforcement officer, was permissible under the search warrant and was reasonable under the Fourth Amendment.
Moreover, the agents did not remove files without a relation to the Baleo investigation and did not seize entire categories of documents to coerce employees into cooperation, as did the agents in Tamura. See 694 F.2d at 595. Their ultimate decision to remove a relevant number of files for off-site review stemmed not from disregard of privacy rights, but from sensitivity to the ongoing disruption caused by the search to CDT — an innocent third party in the underlying investigation. The agents permitted CDT to retain the original Tracey Directory, even though they later explained that this decision may have prevented them from accessing deleted or temporary files that could not be transferred by duplication.[37] The agents took *935 only a limited set of clearly relevant disks and a copy of the Tracey Directory, which included information on players specifically named in the search warrant. Furthermore, just eight days after the search warrant, the agents provided copies of all seized documents to CDT. Here again, the agents demonstrated the careful regard absent in Tamura[38]
We reject the dissent’s view that government officials should limit their computer searches to key words suggested by a searched party. Criticizing the government for “cop[ying] the entire directory” rather than “copying only the subdirecto-ries that pertained to Major League Baseball,” the dissent suggests that the government should have trusted CDT to point out the relevant files. Dissent at 19839. The dissent explains that this approach would have allowed the government to select the relevant files on-site: “Dr. Jean Joseph of CDT later stated in an affidavit that the directory was easily searched by key word and would have provided the test information about the ten players in a short period of time.” Id.
The government had no duty to rely on CDT to illuminate the files seizable under the warrant. Like most searched parties, CDT had an incentive to avoid giving over documents the government might not know to miss. The government had no reason to confine its search to “key words” such as the names of the baseball players. Such a limited search could easily have overlooked relevant documents, as it would have in the case of the seizures at Quest. There, testing results were not saved by key word at all. They were labeled with identification numbers, whose connection to specific players could not be found within the document or at the facility, but were linked in a document kept in a storage locker located at a different address. See supra Section I.B, notes 13-14 and accompanying text.
The government was not required to believe, and had no reason to assume, that all relevant documents in the Tracey Directory would be listed under the names of the baseball players in the warrant. The government’s decision to copy the entire directory represented a conscientious effort to seek out all the evidence covered by the search warrant. We do not discern bad faith or “callous disregard” simply because the agents determined, after an initial review, that certain intermingled files needed to be reviewed off site, as permitted under our applicable precedents and the warrant itself.[39]
*936 5
In light of these considerations, we conclude that the government properly considered and respected the privacy interests, intrusiveness, and law enforcement needs posed by the searches in question by removing a copy of the Tracey Directory (not the original) and taking only limited diskettes and documents containing relevant information. In seizing these files, the government did not show “callous disregard for the constitutional rights of the movant,” Ramsden, 2 F.3d at 325, but instead displayed attentiveness both to the warrant’s precautionary procedures and to the importance of avoiding unnecessary disruption of CDT’s business operations. For these reasons, we conclude that the first prong of the Ramsden analysis (the existence of “callous disregard”) weighs against invocation of the district court’s equitable jurisdiction over the Fed. R.Crim.P. 41(g) motions. The district courts’ conclusions to the contrary were based on faulty conclusions of law and unsupported assertions of fact. They cannot survive appellate review.
B
As to the second of the four Ramsden factors (the movants’ individual interests in the evidence seized), the Players’ Association argues that its interests in the property mirror those of its members. We agree that the members possess strong privacy interests in both their drug test results and the actual specimens. See Roe v. Sherry, 91 F.3d 1270, 1274 (9th Cir.1996) (recognizing an individual’s “strong interest in protecting the confidentiality of [one’s] HIV status”). Because the Players’ Association exists to represent such interests, the district courts properly found that this factor weighed in favor of equitable jurisdiction.
C
The district courts also found satisfied the third Ramsden factor (likelihood of irreparable injury if the evidence were not returned). As the Players’ Association notes, the public release of positive drug testing evidence could irreparably damage the careers of the affected players, even if the positive results were not actually caused by illegal steroid use. Based on this danger, we agree that the third factor also weighs in favor of equitable jurisdiction.
D
Although we conclude that the district courts erred in finding callous disregard of Fourth Amendment rights, the three other equitable jurisdiction factors weigh in favor of hearing the motions by the Players’ Association and CDT. See Ramsden, 2 F.3d at 326 (holding that three factors justified exercise of equitable jurisdiction to hear Fed.R.Crim.P. 41(g) motion). As such, we cannot say that either district court’s initial choice to hear the motion constituted an abuse of discretion.
IV
We turn now to the merits of the substantive rulings issued by Judge Cooper and Judge Mahan that ordered return of all property other than evidence directly related to the ten players named in the search warrants.
*937 A
With respect to property taken during search warrants, Fed.R.Crim.P. 41(g) provides that a person who is deprived of property may move for its return. When such a motion is granted, the property in question must be returned to the moving party, but a court “may impose reasonable conditions to protect access to the property and its use in later proceedings.” Id. Although the rule itself does not set a standard for determining when property should be returned to a moving party, an advisory committee note explains that “reasonableness under all of the circumstances must be the test.” Fed.R.Crim.P. 41 advisory committee’s note.
We have repeatedly held that a Fed. R.Crim.P. 41(g) motion is properly denied if “the government’s need for the property as evidence continues.” United States v. Fitzen, 80 F.3d 387, 388 (9th Cir.1996) (internal quotation marks omitted); United States v. Mills, 991 F.2d 609, 612 (9th Cir.1993) (same). The advisory committee note explains: “If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable.” Fed. R.Crim.P. 41 advisory committee’s note.
It is when the government no longer needs the property as evidence that a presumption arises, giving the owner a right to have the property returned. Fitzen, 80 F.3d at 388. Here, the government already has provided copies of all documents seized, and it states that the remaining evidence is essential to its investigation and prosecution of the distribution of illegal steroids. This legitimate law enforcement purpose makes return of the intermingled evidence improper, as the files were seized legally under the search warrant and our precedent.
Moreover, even in cases where agents seized too much evidence, we have noted that return of property should follow only a particularly egregious violation: “The issue is whether the Government’s conduct was sufficiently reprehensible in this case to warrant this sanction.” Ramsden, 2 F.3d at 327. In Ramsden, we refused to impose this extreme sanction on police who had time to obtain a warrant but made no effort to do so and “simply chose not to comply with[their] obligations under the Fourth Amendment.” Id. at 325, 327.
Our governing precedent offers no support for a full return of the intermingled evidence. Indeed, both the Beusch and Tamura courts underscored the need for effective criminal law enforcement. Thus, the Beusch court resolved: “As long as an item appears, at the time of the search, to contain evidence reasonably related to the purposes of the search, there is no reason — absent some other Fourth Amendment violation — to suppress it.” 596 F.2d at 877. Even the Tamura court — which determined that the agents unambiguously flouted the limits of the search warrant— concluded: “[W]e cannot say, although we find it a close case, that the officers so abused the warrant’s authority that the otherwise valid warrant was transformed into a general one, thereby requiring all fruits to be suppressed.” Tamura, 694 F.2d at 597.
In Tamura, the government did not seek to use evidence at trial that fell outside the scope of the warrant. Therefore, the court found return of the seized property inappropriate, even though some evidence had been unlawfully taken. In the cases before us today, the government has made clear that it desires to use only information related to the ten named Baleo players and to other players who tested positive — and who therefore may have become targets of an expanded grand jury investigation — as a result of intermingled information we have determined was *938 seized lawfully under the warrant. While we agree that some information still retained by the government, at least in duplicate, may fall outside the scope of the warrant, we do not believe a return of the lawfully seized intermingled evidence properly remedies that wrong.[40]
Thus, the district courts erred in granting the Fed.R.Crim.P. 41(g) motions and ordering the government to return all evidence seized from CDT and Quest — and all related notes by agents who reviewed the evidence — that did not relate to the ten Baleo players expressly named in the search warrants.
B
We are persuaded that the government’s seizure of intermingled evidence for off-site review was lawful and reasonable, and we view the two orders requiring return of all property related to players not specifically named as both unjustified and improper. However, the government has yet to comply with its duty of adequate off-site review. Tamura offered a suggested procedure for review by a neutral magistrate, and we conclude that such review is necessary to ensure that the seizure of intermingled computer records remains reasonable.
The Tamura court urged that off-site review be conducted by a magistrate, in order to avoid giving the task to a party with an interest in retaining too much.[41] We cannot accept the government’s argument that it may retain all evidence simply because it assured the Players’ Association and CDT (without signs of bad faith) that it did not intend to use all the files. In the case of a lawful and reasonable seizure of intermingled computer records for off-site review, as at bar, our precedents and the general reasonableness mandate of the Fourth Amendment require the supervision of a magistrate. It is not reasonable to allow the government to seize an indeterminately bounded array of computer data only later to set its own standards for review and retention thereof.[42]
It is true that Tamura proposed a pragmatic approach, and not a constitutional rule. We recognize that some courts in other circuits have questioned the procedures advised in Tamura. One district *939 court in Michigan explained: “The Court declines to follow Tamura, at least in this case, because Tamura did not involve computer files and therefore did not consider the specific problems associated with conducting a search for computerized records.” Scott-Emuakpor, 2000 WL 288443, at *8. Although declining to apply Tamu-ra’s pragmatic approach to computer searches, Judge Quist stated: “This is not to suggest that seizure of all computer disks is permissible whenever the warrant authorizes the seizure of computer records.” Id. Another court, also referencing Tamura, noted that in the modern computer context a “ ‘suggestion’ by a panel of the Ninth Circuit in a 20-plus year old case is not persuasive.” United States v. Kaufman, 2005 WL 2304345, at *4 n. 3 (D.Kan.).
Like these district courts from other circuits, we recognize that the computer era adds new complexity to the test of reasonableness under the Fourth Amendment. Precisely for this reason, we view Tamura as especially important in the computer context. Although indeed writing over two decades ago, the Tamura court appreciated the same dual — and sometimes conflicting — interests of minimizing the intrusiveness of searches and containing the breadth of seizures. The Tamura court stated that “large-scale removal of material” can be justified “where on-site sorting is infeasible and no other practical alternative exists,” Tamura, 694 F.2d at 596, but also advised that a magistrate should oversee the off-site review of documents. We conclude that upon a proper post-seizure motion by the aggrieved parties, the record should be sealed and reviewed by a magistrate— such as the one who originally issued the warrant.[43] This procedure affords the necessary protection against unreasonable retention of property after a seizure of intermingled computer data.
Insofar as the dissent emphasizes the crucial need to set parameters on government seizures and retention of intermingled computer evidence, we agree. On the other hand, the dissent attempts to limit computer searches and seizures to an unreasonable degree — one neither warranted by the Constitution nor by our precedent. The dissent would affirm the district courts’ Fed.R.Crim.P. 41(g) orders in toto, relying upon Tamura yet failing to recognize the continued relevance of Beusch. This extreme approach, which would forbid the seizure of intermingled data, would compel law enforcement agents, when unexpectedly confronted with intermingled computer data, to give up the search and leave. They could only return to the scene if equipped with a new warrant authorizing removal of the specific intermingled evidence, repeating this procedure until all relevant intermingled evidence were obtained. After many such warrants and intrusions, the intermingled evidence might well no longer be intact. Moreover, rather than limit the intrusiveness of a search and seizure of intermingled computer data by allowing the government to *940 remove the whole for off-site review, the dissent’s approach would magnify unnecessarily the burdens imposed by computer search warrants, both on the government and on the parties searched, with no corresponding benefit in light of the constitutional linchpin of reasonableness in Fourth Amendment jurisprudence.
We conclude that, while the government may seize intermingled data for off-site review to minimize intrusiveness of a computer search, it may not retain or use the evidence after proper objections are raised, unless a magistrate subsequently reviews and filters the evidence off-site.[44] The magistrate must adhere to our precedent in a balanced manner. In her review, the magistrate should apply our precedent, including Beusch, which permits the seizure of single ledgers or files with intermingled data. In the context of computer files, we believe that most seized materials can be pared down considerably, but that certain files—spreadsheets of only a few pages, for example—may be retained in whole.[45]
After the magistrate determines which sealed items fall within the search warrant, the government may retain and use such items; all others must be returned to the person or entity searched.[46] The government is always free to seek judicial authorization, either through subsequent search warrants or district court authorization on review of the magistrate’s rulings, to justify expansion of the investigation upon proper showing of any item’s relevancy to suspected criminal behavior uncovered during review of the evidence initially seized.
In this case, we conclude that the proper remedy is to remand these Fed.R.Crim.P. 41(g) matters to the appropriate district courts, for the purpose of sealing the materials seized under the search warrants and transferring them to a magistrate for expeditious review and isolation of the files that the government may legally retain.
V
Finally, we consider the government’s appeal of Judge Illston’s order quashing the May 6 subpoenas, which sought drug testing records and specimens *941 for all MLB players who tested positive for steroids.[47]
Under Fed.R.Crim.P. 17(c)(2), a “court may quash ... [a] subpoena if compliance would be unreasonable or oppressive.” The district court found that the May 2004 subpoenas constituted harassment and were unreasonable.[48]
To support its finding, the district court pointed to United States v. American Honda Motor Co., 273 F.Supp. 810 (N.D.Ill.1967). In American Honda, the government issued subpoenas that were “substantially identical” to one another but in different locations. Id. at 819. As a result, Honda was faced with producing the same documents repeatedly, and the court found this to be harassment. Id. at 819-20. American Honda, however, does not preclude the government from pursuing the same information through the contemporaneous issuance of subpoenas and applications for search warrants.
We addressed the issuance of contemporaneous search warrants and subpoenas in In re Grand Jury Subpoenas Dated December 10, 1987, 926 F.2d at 854. There we upheld the validity of the subpoenas against the challenge that “the subpoenas were served at the same time as the search warrants and the federal agents attempted to ‘enforce’ the subpoenas through immediate seizure of the documents.” Id. at 854. Noting that the challenge to the subpoenas received no support in precedent, we clarified the differences between subpoenas and search warrants:
Subpoenas are not search warrants. They involve different levels of intrusion on a person’s privacy. A search warrant allows the officer to enter the person’s premises, and to examine for himself the person’s belongings. The officer, pursuant to the warrant, determines what is seized.
Id. By comparison:
Service of a forthwith subpoena does not authorize an entry into a private residence. Furthermore, the person served determines whether he will surrender the items identified in the subpoena or challenge the validity of the subpoena prior to compliance.
Id. We concluded that “[t]hese differences are not eliminated by the fact that the search warrants and subpoenas were delivered at the same time” and observed that the complaining party had “failed to show that the papers that are described in the subpoenas are outside the scope of a legitimate investigation by the grand jury.” Id. at 854-55. In addition, we specifically emphasized the fact that the defendant was given almost a month to comply with the subpoenas. Id. at 854.
Therefore, the district court erred in finding the issuance of subpoenas and the contemporaneous execution of search warrants to be unreasonable. The Players’ Association has not argued that the evidence sought by the subpoenas is “outside the scope of a legitimate investigation by the grand jury.” Id. at 855. The subpoenas were not returnable on the same day that the search warrants were executed. As in In re Grand Jury Subpoenas, the return dates on the subpoenas were over a month from the date on which the warrants were executed. The district court declared the May 6 subpoenas an “unreasonable insurance” policy, but it failed to recognize the different purposes and requirements of the warrant as compared to *942 the subpoena and the legitimate concern that production of relevant evidence to the grand jury would be unduly delayed. See id. at 854. It was error to conflate the two distinct tools. Insurance it may have been; but, under the Fourth Amendment, unreasonable it was not.
The district court also deemed the government’s actions unreasonable because it found that the agents sought search warrants in three separate districts in an attempt to avoid a ruling on the motion to quash the existing subpoenas of January and March 2004. We note that granting the motion to quash would not have prevented the government from seeking the search warrants, particularly given the existence of probable cause. As the Fourth Circuit has noted, “the fact that a grand jury subpoena existed ... at the time of the search obviously had no effect upon whether probable cause existed to search ... for documents which were properly included within the warrant’s scope.” United States v. Photogrammetric Data Servs., Inc., 259 F.3d 229, 238 (4th Cir. 2001), overruled on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
As such, the district court rested its order on legally insufficient grounds, and abused its discretion in granting the motion to quash. See United States v. Iverson, 162 F.3d 1015, 1026 (9th Cir.1998).
VI
Finally, we address the Non-Party Journalist’s Motion To Unseal, filed on November 23, 2005 by Joshua A. Gerstein. Gerstein seeks access to “the dockets for these appeals and the cases below, the district court opinions and/or orders that are the subject of these appeals, and all briefs filed with this Court.”[49] We have jurisdiction over these documents, because the district courts’ records transferred to us upon appeal. See Fed. R.App. P. 11.
Although not a party, Gerstein enjoys standing to file the motion based upon his constitutional interest in the proceedings:
Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents .... This presumed right can be overcome only by an overriding right or interest “based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.”
Oregonian Publ’g Co. v. District Court, 920 F.2d 1462, 1465 (9th Cir.1990) (quoting Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)).[50] The Supreme Court has noted the particular interest of media members in “publish[ing] information concerning the operation of government.” Nixon v. Warner Commc’ns, Inc., *943 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).
To decide whether Gerstein’s interest justifies unsealing portions of the records, the court also must consider the privacy interests of the litigants, for “the right to inspect and copy judicial records is not absolute.” Id. In the appeals at bar, the records contain extremely sensitive information, especially the drug-testing records. If revealed, this information could adversely affect the reputations of many competitive baseball players. Therefore, the motion to unseal requires a careful balancing of the interests at stake. See id. (noting that access to judicial records may be limited to protect the privacy interests of the litigants, such as to avoid disclosure of “sources of business information that might harm a litigant’s competitive standing”).
Although we have jurisdiction to conduct a merits analysis of the motion to unseal, the district courts — having greater familiarity with the records[51]- — are in a better position to balance the privacy interests and to determine which materials are protected grand jury materials. See Fed. R.Crim.P. 6(e). Therefore, we refer the Gerstein motion to the district courts for consideration upon remand.[52]
VII
We now summarize the resolution of these consolidated appeals. We conclude that the government’s seizures were reasonable under the Fourth Amendment, and that the district courts erred in ruling that Fed.R.Crim.P. 41(g) required return of all property and agent review notes unrelated to the ten expressly named Bal-eo players.
At the same time, we recognize limits to the government’s right to retain evidence seized, even where a broad seizure is reasonable in order to avoid lengthy and intrusive on-site inspection. Our Fourth Amendment precedents explain that the government may retain single “ledgers” of intermingled evidence, but may not keep separate, unrelated evidence. A magistrate is in the best position to sort through the actual evidence and to determine those files that may be kept when aggrieved parties seek relief. Readily separable evidence unrelated to persons named in the search warrants must be returned. The Fed.R.Crim.P. 41(g) cases must be remanded to the District of Nevada and Central District of California to permit such review of the sealed documents by magistrates.
With regard to the May 6 subpoenas, which covered the same evidence as the contemporaneous search warrants, we conclude the order of the Northern District of California quashing the subpoenas was an abuse of discretion. The record, illuminated by caselaw, reveals that the subpoenas were not unreasonable and did not constitute harassment.
Therefore, the orders of the Central District of California, the District of Nevada, and the Northern District of California cannot stand. The three cases consolidated in this appeal are hereby
REVERSED in part and REMANDED in part.

. The courts also required the government to turn over all notes made by agents who reviewed the challenged evidence.

. Again, the government was also required to give up all notes made by reviewing agents.

. "Major League Baseball,” an unincorporated association, consists of two professional baseball leagues' — -the National League of Professional Baseball Clubs and the American League of Professional Baseball Clubs.

. The names of the players are under seal and are not disclosed in this opinion.

. CDT is a third-party administrator of "drug and alcohol testing programs” that was hired to oversee MLB's drug use evaluation program. The company includes "top experts in pharmacology, forensic toxicology, laboratory management, medical review, legal, and administrative compliance.” See Comprehensive Drug Testing: About Us, http:// www. cdtsolutions.com/abou1_us.html (last visited Nov. 10, 2006).

. Quest offers laboratories that conduct "drugs of abuse testing and therapeutic drug monitoring” with "the most advanced methodologies available.” See Quest Diagnostics: Diagnostic Testing & Services, http:// www. questdiagnostics. com/brand/business/b_bus_ lab_index.html (last visited Nov. 10, 2006). Quest's laboratory in Las Vegas performed the drug testing on the player specimens at issue in these consolidated appeals.

. The government later decided not to seek drug testing evidence related to one of the eleven players, and on April 22, 2004, sent a letter to the counsel for CDT withdrawing requests for documents related to that player.

. The testing records at issue in these cases were created pursuant to a collective bargaining agreement between Major League Baseball and the players of Major League Baseball (represented by the Major League Baseball Players' Association).

. The pursuit of search warrants in different districts was proper under the applicable federal rule, which gives a magistrate judge the authority "to issue a warrant to search for and seize a person or property located within the district,” "to issue a warrant for a person or properly outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed,” or "in an investigation of domestic terrorism or international terrorism ... [to] issue a warrant for a person or property within or outside that district.” Fed. R.Crim.P. 41(b).

. The affidavit for the search warrant in the District of Nevada advised the court that Quest “intend[ed] to move to quash the subpoena.” Later, that language was crossed out and replaced with a handwritten note: "A motion to quash has been filed. 4.7.04,” followed by Judge Leavitt's initials.

. See infra Section III.A.2.

. The April 8 warrant also expressly authorized the seizure of "correspondence” and "emails” detailing or explaining Quest's administration of the drug testing program.

. A separate group of federal agents had simultaneously executed a separate search warrant at Quest’s Las Vegas laboratory, but they were unable to locate the specimens to be seized, because the specimens were identified by number only. Agents used the master list from CDT to apply for a third search warrant. The new warrant for Quest was authorized by Judge Leavitt in the District of Nevada at 6 p.m. that evening, and agents seized the then-identifiable Baleo players’ specimens later that same night. This opinion focuses on the search of CDT, because the motions for return of property were premised on the government’s conduct during that search.

. Some time later, agents located a billing document for CDT's off-site Long Beach storage locker. After agents obtained a fourth warrant, which allowed them to search and seize evidence in the locker, a CDT director agreed to open the compartment for the agents.

. Copies of all seized documents were provided to CDT by the government on April 16, 2004.

. On April 30, the government applied for a fifth search warrant in the Northern District of California, asking for authorization to "seize” all electronic data "regarding drug specimens, drug testing, specimen identification numbers, athlete identification numbers, and drug test results, retained by [CDT] ... pertaining to the drug testing of Major League Baseball players, located within the copy of a CDT computer sub-directory currently in the possession of the [Internal Revenue Service ("IRS”) ] in San Jose, California, identified as the 'Tracey' sub-directory, bearing the following computer file group names: (1) 'MAJOR LEAGUE GROUP' (2) 'MLB BILLING’ (3) 'MLB Drug Subcommittee' (4) 'MLB Follow UP' (5) 'MLB IOC.' ” Because this copy of the Tracey Directory was in the hands of the IRS in San Jose, in the Northern District of California, the government sought the search warrant in that district. Magistrate Judge Howard Lloyd approved the warrant. The government did not notify CDT, presumably because the IRS already had in its possession the copy of the entire directory containing the relevant materials.
The Players’ Association subsequently filed a Fed.R.Crim.P. 41(g) motion in the Northern District of California seeking return of any property taken pursuant to the April 30 search warrant, and on August 9, 2004, Judge Illston granted this motion. The government did not appeal the order and does not dispute it now. Instead, the government asserts that it retains the right to review the Tracey Directory based upon the April 7 search warrants, a contention we address in this consolidated appeal.
Insofar as the dissent suggests that the pursuit of the April 30 search warrant evidences bad faith harassment by the government and an attempt to evade a possibly adverse order on the motion for return of property filed in the Central District of California, we decline to speculate. We have no reason to believe that the government sought the April 30 warrant for purposes of harassment, rather than to avoid an additional search of CDT that would have followed from authorization to seize the original copy in the Central District. Since no district court has ever held an evidentiary hearing, and the government complied with the commands of the criminal rules to secure search warrants from the magistrate judges in whose districts the property was located, based upon a showing of probable cause that incriminating evidence would be found, we see no signs of bad faith to support the district courts’ contrary conclusion.

.Fed.R.Crim.P. 41(g) reads:
Motion To Return Property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property’s return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

. See supra note 9.

. The government moved for a stay of this order because the evidence was otherwise lawfully in its possession pursuant to the subpoena of May 6, 2004. Judge Mahan denied the motion on November 1, 2004, based on the government's failure to raise the subpoena argument at the original hearing.

. We discuss the inapplicability of this warrant exception in Section III.A.4. See infra note 39.

.These subpoenas were not the earliest ones issued in the investigation. The first subpoenas dated to January 16, 2004, and mandated the provision of all MLB drug testing records. On March 3, 2004, the government obtained narrower subpoenas for eleven Balco-con-nected players. On April 22, 2004, the government sent a letter to CDT withdrawing the January 2004 subpoenas. In the same letter, the government reduced the March 3, 2004, subpoenas to ten, not eleven, Baleo players. At the time the government obtained the May 6 subpoenas, the only outstanding subpoenas were those of March 3, which sought the *925 records of ten players with Baleo connections.

. Recognizing that the documents they seized from CDT pursuant to the April 7 search warrant might not have included all documents relevant to the investigation (even with regard to Balco-related players, see infra note 37), and deciding that the positive test results uncovered for MLB players beyond the ten with Baleo connections could be valuable to the investigation, the government asked for a broader warrant on May 6 in the Central District of California.

. We need not decide whether the Players' Association has standing to challenge the CDT seizures because CDT is a party and has standing on its own to seek return of the property seized from its office and storage locker.

. The Supreme Court has clearly rejected "vicarious” or “target” standing to assert Fourth Amendment rights. See Rakas v. Illinois, 439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (refusing to extend standing to a party who was not a "victim” of the search); see also United States v. Taketa, 923 F.2d 665, 669-70 (9th Cir.1991) (following Rakas, 439 U.S. at 134, 99 S.Ct. 421, and holding that a defendant did not have standing to challenge a search of another defendant’s office). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.” Rakas, 439 U.S. at 134, 99 S.Ct. 421 (emphasis added). Because we are satisfied that the Players' Association has met the requirements of associational standing, we do not reach its argument that it has an ownership interest in the seized items sufficient to establish standing in its own right. We leave that question for another day.

. An initial analysis of the specific local and federal rules is necessary in order to decide whether the rules conflict. Rule 59(e) and Rule 60(b) differ greatly, and a local rule that appears inconsistent with one may well be consistent with the other. See Fed.R.Civ.P. 59(e) ("Motion to Alter or Amend Judgment. Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.”); see infra at 927-28 (citing Fed.R.Civ.P. 60(b)).

. For the same reason, the motion is not one to "alter or amend the judgment” under Fed. R.Civ.P. 59(e).

. Marshall does not hold that the possibility of conflict between local and federal rules should be avoided by ignoring the local rule. Indeed, in Marshall the court found the local rule applicable, although “the local rule appeared] to be inconsistent with the federal rule governing summary judgment to the extent that it bars a party from submitting affidavits in opposition to summary judgment prior to the day of the hearing.” 44 F.3d at 724. The court "engage[d] in an interpretation in order to produce consistency,” id. at 725, and concluded that the federal rule "d[id] not unconditionally require a district court to accept affidavits up to the date set for hearing on the motion for summary judgment.” Id. Marshall avoided conflict by refusing to interpret the federal rule in a way that would render invalid the local rule. Harmonizing federal and local rules may often leave both intact.

. The dissent takes a curious position, at once arguing that "the district court did not have jurisdiction to consider the original motion” and at the same time stating that the district court’s denial of the motion for reconsideration — following a three-page discussion of the merits of the motion — was "proper.” In the absence of jurisdiction, a discussion of the merits is inappropriate. See Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 379, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) (noting the familiar rule that a "court lacks discretion to consider the merits of a case over which it is without jurisdiction”). In the absence of jurisdiction, dismissal — not denial on the merits — is appropriate.

. We review a district court’s decision to exercise equitable jurisdiction under Fed. R.Crim.P. 41(g) for abuse of discretion. Ramsden, 2 F.3d 322, 324 (9th Cir.1993). We review the district court's interpretation of Fed.R.Crim.P. 41(g) de novo. Id. The lawfulness of a search and seizure is also reviewed de novo. United States v. Mendoza-Ortiz, 262 F.3d 882, 885 (9th Cir.2001) (per curiam).

. Significantly, while a subpoena may be quashed, a "person to be searched has no lawful way to prevent execution of the warrant.” In re Grand Juy Subpoenas Dated December 10, 1987, 926 F.2d at 854. His remedy for an unlawful search and seizure or for the deprivation of property is to seek return of anything seized under Fed.R.Crim.P. 41(g), or, if charges are filed, to move to suppress use of the evidence against him at trial, see Fed.R.Crim.P. 12(b).

. To the extent that Judge Cooper relied on any failure by the government to comply with the United States Attorney’s Manual, such reliance is unwarranted. The Manual "does not create any substantive or procedural rights,” United States v. Fernandez, 231 F.3d 1240, 1246 (9th Cir.2000), and thus any violation of procedures established therein cannot independently establish a Fourth Amendment violation. We do not suggest that deviations from United States Attorney’s Manual have no significance. Rather, we conclude that such deviations in the case at bar do not rise to the level of a constitutional or statutory violation that would render granting a motion for return of property appropriate. It certainly does not support an order depriving the grand jury of the use of such evidence in aid of its expanded criminal investigation.

. The record does not contain evidence that the motion to quash was filed in the Northern District early enough in the day for the government to know of it before filing its affidavit in the Central District.

. See supra note 10.

. The Tamura court suggested that the American Law Institute’s Model Code of Pre-Arraignment Procedure could guide agents to avoid constitutional violations. 694 F.2d at 595-96.

. We note that these requirements are not the mandates of the Fourth Amendment. If the warrant had not specified the need for computer analysts, police would have been "free to hire such experts to help them conduct a search ... and it may well be praiseworthy for them to do so.... But the Fourth Amendment does not require it.” Hill, 322 F.Supp.2d at 1088 (citing Tamura and other cases that suggest the involvement of specialized personnel) (citations omitted).

. We do not believe that the warrant can be fairly read to require computer personnel to execute all aspects of the search. For example, the more basic computer recoveries could easily be completed by nonspecialized law enforcement officers, considering that the type of files at issue were simple spreadsheets. In today's world anyone with the most rudimentary computer skills qualifies as "appropriately trained” when it comes to opening and viewing basic spreadsheets on a modern computer: presumably any computer user can double-click a selected document or press the "Enter” key after selecting the desired file.
We recognize that, had CDT stored test results in a Relational Database Management System requiring specialized expertise to extract data, only an agent specifically trained in using such a system might be considered "appropriately trained.” However, we do not interpret the warrant to require only Computer Investigative Specialists to perform elementary tasks such as scan a spreadsheet for the persons named in a search warrant, particularly when, in the end, the spreadsheets would still have been seized. The search warrant form employed in these cases authorized a search by "Any Special Agent[s] with the United States Internal Revenue Service or any other authorized officer,” and was not restricted to searches only by computer investigative specialists.

.Recognizing that the documents they seized on April 8 may not have included all documents relevant to the investigation, Agent Novitzky asked for a broader warrant on May *935 5 in the Central District of California. He explained that "IRS Special Agent Jeff Jack, a Computer Investigative Specialist ... gave me specific examples of deleted files or temporary files created when printing a file that cannot be[] seen or retrieved from a simple copy of a computer sub-directory, but may be retrievable using forensic tools, if allowed to examine the entire computer system.” Had the government engaged in a "wholesale seizure” of all possibly relevant material, as in Tamura, they surely would have seized the entire computers, rather than made duplicates so as to allow CDT to continue its use of the originals. See also United States v. Scott-Emuakpor, 2000 WL 288443, *8 (W.D.Mich.) (“|T]he agents were not confined to searching the files on the hard drive and disks but could also lawfully search for deleted material ... the seizure of [items other than hard drives and disks] was reasonable because it allowed the agents to preserve the computer system as it existed for the computer analysts ... without taking the risk of losing any files.”).

. In Tamura, the agents retained master volumes they knew held information not covered by the search warrant "for at least six months after locating the relevant documents." Tamura, 694 F.2d at 597. In contrast, the agents in the cases at bar never seized the master hardware with the Tracey Directoiy.

. We do not reach the government's argument that the "plain view” exception to the warrant requirement justified seizure of the *936 intermingled evidence, because the evidence fell within the scope of the search warrant. See Beusch, 596 F.2d 871 ("Because we hold that the items seized were covered by the terms of the warrant, we find it unnecessary to deal with the Government's contentions that they were admissible under the 'plain view' exception to the warrant requirement.”).

. The orders of the two district courts would require the return of all evidence other than that related to the ten named players. We have described in detail why this view misinterprets Tamura in a way that would invalidate lawful and reasonable searches and seizures. It would also hamper the public interest in full and comprehensive investigations as leads unfold in the course of the grand jury’s inquiries.

. It is not necessary that a magistrate always give advance authorization for seizures of intermingled evidence. Here, as in United States v. Hay, 231 F.3d 630 (9th Cir.2000), we do not read Tamura to require prior authorization for off-site review. See id. at 637 (finding Tamura "inapposite ... for its suggestion that magistrate judges should approve seizure of materials beyond those described in the warrant before wholesale removal occurs” (emphasis added)). However, we still read Tamura to apply in a significant way in the context of lawful seizures of intermingled computer data.

.We do not belabor the government’s alleged failure to follow its own internal guidelines. The dissent takes note that the U.S. Attorney's manual states "that a search warrant should normally not be used to obtain confidential materials such as treatment records,” and that the Department of Justice’s guidelines disfavor use of a search warrant where a subpoena would suffice. See Dissent at 19866. The existence of those guidelines is not disputed. Yet, quite simply, the government’s guidelines do not dictate what is "reasonable” under the Fourth Amendment. If its guidelines did so, the government would have every reason to enact permissive internal rules. We have no reason or authority to give the government that perverse incentive.

. The dissent mistakenly concludes that this procedure allows the government to establish "what the Fourth Amendment required it to do in the first: instance: [that] probable cause exists to seize and search the property.” Dissent at 19894. The point of the Tamura procedure is to ensure that intermingled documents, legitimately seized for off-site review under a warrant supported by probable cause, do not contain documents that turn out, upon scrutiny, to be easily separable. In a seizure of a plethora of documents containing relevant material interspersed with irrelevant documents, it is predictable that some documents, although legitimately seized for off-site review, turn out to be separable without changing the nature of the relevant documents. The purpose of the Tamura procedure is to monitor the off-site separation process, not to establish probable cause.

. We note that the government has little to lose by following this precaution. A magistrate will allocate to the government whatever property it may legitimately retain under the warrant. Yet if agents rely on their own judgment, they may err on the side of retaining items outside the search warrant or err on the side of returning evidence our precedents would permit them to retain.

. In this analysis, the magistrate may consider relevant, among other factors: 1) whether evidence mentioned in the search warrant can be separated from unrelated evidence by copying or moving files, but without creating new documents, 2) whether the file, if printed, would fill more than a typical paper ledger (of the sort in Beusch), 3) whether excision of the unrelated portions of the document would distort the character of the original document. This list is neither exhaustive nor mandatory, but offers relevant considerations for a magistrate to determine what evidence the government can reasonably retain after a lawful seizure of intermingled digital data.

.This approach does not permit the government to seize computer files "wholesale,” without any effort to limit the documents seized. Nothing we suggest lifts the Fourth Amendment's bar on "unreasonable searches and seizures.” U.S. Const. amend. IV. Like the Beusch and Tamura courts, we point out the parameters of a reasonable search and seizure in the complex context of intermingled files. Case-by-case evaluation remains essential, because our Founding Fathers chose a general prohibition on unreasonable searches; they did not create a rigid rule that could at times prove too permissive and at times prove too strict.

. We review a district court’s decision to quash a grand jury subpoena for abuse of discretion. In re Grand Jury Subpoenas, 803 F.2d at 496.

. The district court did not find that the subpoenas were oppressive.

. Oral proceedings before this court on November 15, 2005, were open to the public. On November 9, 2005, CDT and MLB filed an unopposed Motion To Seal Courtroom During Oral Argument. We denied the motion the next day. On November 14, 2005, CDT and MLB filed a Motion for Reconsideration of Motion To Seal Courtroom During Oral Argument, which the government joined. We denied the motion the same day.

. Gerstein premises his motion on Ninth Circuit Rule 27-13(c). That rule states: "During the pendency of an appeal, any party may file a motion with this court requesting that matters filed under seal either in the district court or in this court be unsealed. Any motion shall be served on all parties.” Id. (emphasis added). Although Joshua Ger-stein is not a "party” under this rule, his standing derives from his constitutional interest and does not depend upon the applicability of Ninth Circuit Rule 27-13(c).

. Sensitive portions of the records were neither revealed nor discussed at oral argument before this court. See supra note 49.

. In the Central District of California and District of Nevada, the motion can be addressed during the remand pursuant to this opinion. See infra Section VII. The motion will need to be separately decided in the Northern District of California.